**Barbara Jean BERRY et al., Plaintiffs,**

**v.**

**SCHOOL DISTRICT OF the CITY OF BENTON HARBOR et al., Defendants.**

**No. C.A. 9.**

United States District Court, W. D. Michigan, S. D.

Nov. 9, 1978.

Louis R. Lucas, Elijah Noel, Jr., Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas Atkins, Roxbury, Mass., John A. Dziamba, Willimantic, Conn., Stuart J. Dunnings,

Jr., Dunnings & Gibson, Lansing, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP Sp. Contribution Fund, New York City, for plaintiffs.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Roccy M. DeFrancesco, Adams & DeFrancesco, St. Joseph, Mich., for Benton Harbor School Bd.

John L. Crow, Francis A. Jones, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Claire School Dist.

George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for State of Mich.

E. Michael Stafford, Farhat, Burns & Story, Lansing, Mich., for Coloma School Dist.

Lee Boothby, Boothby & Huff, Berrien Springs, Mich., for Sodus Tp./Fellner Group.

Andrew J. Burch, Coloma, Mich., for intervening defendants Baldwin and Concerned Parents of Hagar Tp. School Dist. No. 4.

Thomas J. Nordberg, Lansing, Mich., for Berrien County Intermediate School Dist.

## OPINION

FOX, Chief Judge.

In Phase I of these proceedings, this court ruled that the Benton Harbor Area School District (BHASD) had failed to rebut a prima facie case of de jure school segregation which had been established against it at an earlier trial. *Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280 (W.D.Mich.1977). In Phase II, this court found that the following defendants, through their intentional actions and inactions, helped to create and/or perpetuate the unlawfully segregated conditions in the Benton Harbor Area School District: the Governor of the State of Michigan, Attorney General of the State of Michigan, Superintendent of Public Instruction of the State of Michigan, the State Board of Education, the Berrien

County Intermediate School District and its Superintendent, and the Coloma and Eau Claire School Districts and their Superintendents. *Berry v. School District of the City of Benton Harbor* (W.D.Mich.1978), 467 F.Supp. 630. On August 7, 1978, an amended order was issued which required that defendants found liable in Phases I and II formulate a plan which will remedy the constitutional violations found by this court. Portions of this amended order are now being questioned by defendants Governor, Attorney General, State Board of Education, Superintendent of Public Instruction, Berrien County Intermediate School District and Berrien County Superintendent.

In addressing these claims, this court realizes that any decision it reaches will be of particular interest to all residents of the Berrien County Intermediate School District. In a case such as this, which may have a great social impact, this court has consistently adhered to the belief that its opinion must serve a twofold purpose: it must set forth the factual and legal bases for its decision so that the parties will be properly instructed and a reviewing court can properly analyze it, and at the same time the opinion must be written so that the public can comprehend it and be educated by it.[1] To meet these two goals, this court has gone into more detail than might otherwise be required, and has even attached appendices.

It is unfortunate that a single judge has to make decisions concerning the education of our children and the desegregation of their schools, but when other governmental entities fail to act then the courts must protect the constitutional rights of the citizens. In construing the Constitution, a court must liberally construe its articles and amendments so as to accomplish the intent of the drafters. The intent of the Thirteenth, Fourteenth, and Fifteenth Amendments was to eliminate the stubborn vestiges of slavery by bringing the slaves and

---

1. This court has followed this practice on at least two occasions. *See, Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280 (W.D.Mich.1977); *NAACP v. Lansing Board of Education,* 429 F.Supp. 583 (W.D. Mich.1976).

their descendants to comparable equality under the law with their former owners and all other citizens. This was a view which was expressed as early as 1896 in Justice Harlan's dissent in *Plessy v. Ferguson,* 163 U.S. 537, 552, 16 S.Ct. 1138, 1144, 41 L.Ed. 256, 261 (1896), wherein the majority of the Court created the "separate but equal" doctrine.[2] If Justice Harlan's dissent had been adopted by the Supreme Court, then many of today's problems would have been avoided. Justice Harlan stated:

But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.

The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved. It is therefore to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a state to regulate the enjoyment by citizens of their civil rights solely upon the basis of race.

**2. JOHN MARSHALL HARLAN**

John Marshall Harlan of Kentucky was rated as one of the 12 greatest justices ever to serve on the Supreme Court in a 1972 evaluation by 65 law school deans and professors of law, history and political science.[72]

The father of Justice Harlan was an attorney. He wanted his son to be a lawyer from the time of his birth in what is now Boyle County, Kentucky, on June 1, 1833. The father's ambitions for his son were responsible for his naming him John Marshall, after the famous Chief Justice of the United States. Justice Harlan was graduated from Centre College and Transylvania University Law School. Subsequently he was elected Attorney General of Kentucky, and was appointed to the Supreme Court in 1877 at the age of 44. He served on the Supreme Court for almost 34 years and his opinions are published in 126 volumes of the Supreme Court Reports. He wrote 745 majority opinions, 100 concurring opinions and 316 dissents. Best known for his dissenting opinions in the area of civil rights, he was the

In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the *Dred Scott Case.* . . . What can more certainly arouse race hate, what more certainly create and perpetuate a feeling of distrust between these races, than state enactments which, in fact, proceed on the ground that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens?

*Id.,* at 559, 16 S.Ct. at 1146–1147, 41 L.Ed. at 263–264.

The political artificial school district boundaries have created on a state-wide basis discriminatory racial classes condemned by Justice Harlan.

58 years later, in an opinion written by Chief Justice Warren, a unanimous court overturned the *Plessy* "separate but equal" doctrine, saying that in public education separate was inherently unequal.

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the

lone dissenter in *Plessy v. Ferguson,* 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256] (1896). Declaring that "our Constitution is color-blind", he made the prophecy: "In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the *Dred Scott case* [*Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691]." 163 U.S. at 559 [16 S.Ct. 1138].

In the *Civil Rights Cases,* 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835] (1883), Justice Harlan dissented from the views taken by the majority with respect to the Civil Rights Act of March 1, 1875, contending that the majority opinion proceeded "upon grounds entirely too narrow and artificial."

He filed a vigorous dissent in *Pollock v. Farmers' Loan and Trust Co.,* 158 U.S. 601 [15 S.Ct. 912, 39 L.Ed. 1108] (1895), in which five justices held that Congress had no power to levy an income tax.

History of the Sixth Circuit, A Bicentennial Project, P. 57.

performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where *the state has undertaken to provide it, is a right which must be made available to all on equal terms.*

We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.

In *Sweatt v. Painter, supra* [339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114], in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on "those qualities which are incapable of objective measurement but which make for greatness in a law school." In *McLaurin v. Oklahoma State Regents, supra* [339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149], the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: " . . . his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession."

Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by

a court which nevertheless felt compelled to rule against the Negro plaintiffs:

"Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." [10]

Whatever may have been the extent of psychological knowledge at the time of *Plessy v. Ferguson,* this finding is amply supported by modern authority. Any language in *Plessy v. Ferguson* contrary to this finding is rejected.

We conclude that in the field of public education *the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal.* Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment. (Emphasis supplied.)

13 years after *Brown v. Bd. of Ed. of Topeka, Kan.,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 the Supreme Court in *Green v. County School Board,* 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), stated that delays in integrating public school systems were no longer tolerable. The Court held that:

In determining whether respondent School Board met that command by adopting its "freedom-of-choice" plan, it is relevant that this first step did not

come until some 11 years after *Brown I* [*Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873] was decided and 10 years after *Brown II* directed the making of a "prompt and reasonable start." This deliberate perpetuation of the unconstitutional dual system can only have compounded the harm of such a system. Such delays are no longer tolerable, for "the governing constitutional principles no longer bear the imprint of newly enunciated doctrine." *Watson v. City of Memphis, supra*, 373 U.S. [526] at 529 [83 S.Ct. 1314 at 1316, 10 L.Ed.2d 529]; see *Bradley v. School Board [City of Richmond, Va.]*, supra [382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187]; *Rogers v. Paul*, 382 U.S. 198 [86 S.Ct. 358, 15 L.Ed.2d 265]. Moreover, a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. *"The time for mere 'deliberate speed' has run out,"* Griffin v. County School Board [of Prince Edward County], 377 U.S. 218, 234 [84 S.Ct. 1226, 1235, 12 L.Ed.2d 256], "the context in which we must interpret and apply this language [of *Brown II* ] to plans for desegregation has been significantly altered." *Goss v. Board of Education [of City of Knoxville, Tenn.]*, 373 U.S. 683, 689 [83 S.Ct. 1405, 1409, 10 L.Ed.2d 632]. See *Calhoun v. Latimer*, 377 U.S. 263 [84 S.Ct. 1235, 12 L.Ed.2d 288]. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*. (Emphasis supplied.)

Today it is almost a quarter of a century since *Brown* was decided, and many school districts in both the North and South are no closer to eliminating segregation than they were twenty-five years ago, for school districts still contain the discriminatory racial classes condemned by Justice Harlan. There is no excuse for this, particularly in Michigan, because the drafters of the Michigan Constitution of 1963 made drastic changes in education and civil rights with the obvious intent of eliminating discrimination throughout the entire public school system. *See* "What The New State Constitution Means To You" (August 1, 1962); Appendix C. They placed the burden of accomplishing this objective squarely on the State Board of Education, Superintendent of Public Instruction, Governor, and Attorney General; not on the federal courts. However, the intent of the drafters has been completely foiled, for those entrusted with eliminating discrimination have failed to act, and in some instances have vigorously fought those who seek to uphold the Constitution's guaranty of equality. In such a case, the residents of a local school district have had no other recourse except to invoke a court's help, often times at great personal expense and sacrifice. The litigation also results in the expenditure of taxpayers' dollars; this is money which could be better spent in providing for the needs of the school children.

Compulsory school attendance laws must provide each child his or her right to an equal educational opportunity. School boards and superintendents assign students to a particular school. Some are assigned to integrated schools and some are assigned to separate segregated schools. Under Michigan's Constitution, each time and each day a school authority assigns a student to a separate segregated school he commits a discriminatory act of segregation.

It is the earnest hope of this court that this opinion will make it unnecessary for a court to ever have to decide another Michigan school desegregation case. Such decisions have, in part, been prompted by the failure of the state and intermediate school authorities to affirmatively search out and eradicate any discrimination which may exist in Michigan's school districts. These are affirmative duties which have been imposed by the Michigan Constitution, Michigan statutes and defendants' own public policy declarations; this opinion seeks only to activate these affirmative duties by requiring that defendants survey their constituent districts for any discrimination. If the state and intermediate education authorities vigorously search for acts of discrimination, it should not be necessary for a court

to become involved. This will benefit all citizens.

### Factual History

The facts underlying the present dispute are fully set forth in this court's two earlier opinions which portray a classic case of institutional racism and discrimination. In Phase I, this court found the Benton Harbor Area School District guilty of unlawfully segregating the Benton Harbor public schools. *Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280 (W.D. Mich.1977). Its constitutional violations were found to have pervaded the entire school district. Among the violations were the assignment of teachers on the basis of race, discriminatory "tracking" programs at one junior high, disparate conditions of facilities and educational supplies, intact busing, segregative feeder patterns, discriminatory placement of portable classrooms and temporary facilities, and the inconsistent application of a neighborhood schools policy.

In Phase II, this court found that as early as 1970 the State defendants and the Berrien County Intermediate District were aware of the problems and conditions which existed in the BHASD. In 1970, Judge Wallace Kent found that the BHASD had illegally segregated its teaching staff, used discriminatory "tracking" programs, and adhered to a neighborhood school policy that denied equal educational opportunity. Further information about the segregation in Benton Harbor was acquired through the hearings concerning petitions to transfer property out of the BHASD, and through the State Board's and Berrien County Intermediate District's participation on the "Blue Ribbon Committee" which received reports from the "Redistricting Planning Committee." Despite their receipt of this information, which should have alerted them to the discriminatory segregation existing in Benton Harbor's public schools, the State and Intermediate school defendants failed to take any action to remedy these constitutional violations. This court ruled that in light of the Michigan Constitution, the laws of Michigan, and the 1966 Joint Policy Statement of the State Board of Education and the Michigan Civil Rights Commission, the State Board and the Berrien County Intermediate School District should have taken affirmative steps to eradicate this discriminatory segregation. By failing to act, it indicated that they were sanctioning the segregation and this was a clear statement to the BHASD Board that it could continue its policy of racial separation.

These were not the only acts of intentional, discriminatory segregation committed by the State and Intermediate defendants. In Phase II, this court also found that the Berrien County Intermediate District's approval of the Sodus II property transfer was done with segregative intent because it was designed to allow White residents of the district to escape from the majority-Black Benton Harbor district. The State Board was similarly found to have committed acts of discriminatory segregation when it approved the Eaman and Sodus II property transfers because it knew that they would result in increased segregation in the Benton Harbor Area School District.[3]

In this court's amended order, which required that defendants submit proposed remedies which would alleviate the effects of their constitutional violations, defendants State Board of Education and Berrien County Intermediate School District were ordered to undertake the following remedial acts:

(4) The State Board of Education and its Superintendent have been entrusted with the leadership and general supervision of all public schools in Michigan. Mich. Const., art. VIII, § 3. This court has

---

3. In this court's Phase II opinion, it also found that the Coloma and Eau Claire School Districts had committed acts of discriminatory segregation. Coloma's liability was predicated on the fact that through its action and inaction it indicated to the State Board that it would not oppose the Eaman property transfer. Eau Claire's liability was based on its lavish acceptance of transfer students from Benton Harbor, and the fact that it was a prime mover behind the Sodus II property transfer petitions.

found, however, that they have failed as both leaders and supervisors for they failed to implement the Joint Policy Statement even though they were aware of the segregation which existed in Benton Harbor. Therefore, this court permanently enjoins the State Board of Education and its Superintendent from any further acts which would maintain, create, or facilitate the existence of racial segregation and discrimination in the public schools of Berrien County, including the granting of property transfers which have racially segregative impacts.

. . . . .

(11) The State Board of Education is required to affirmatively put into practice the educational policies of the State and of the Board, and foremost among these policies is the assurance that education be provided without discrimination. Mich. Const., art. VIII, § 2. The Berrien County Intermediate School District has similar duties as this court has found it to have an affirmative duty to offer its supervisory or consultant services to local districts in order to remedy de jure segregation and its effects.

In light of these affirmative duties to eradicate de jure segregation, this court orders the State Board of Education and the Berrien County Intermediate School District to undertake a detailed examination of all school districts in Berrien County, especially St. Joseph, Watervliet, River, and Riverside, to determine if de jure segregation has at any time existed in these districts, and if so, to determine if all vestiges of this discrimination have been eradicated. All findings will be released to this court as soon as they are ready.

It is these paragraphs which are now in question. Defendants State Board and Berrien County Intermediate District claim that this court has no jurisdiction to order

them to examine other school districts in the BCISD for discriminatory segregation because these other districts were not parties in the instant suit. Defendant State Board also wants to know if, under paragraph 4 of the amended order, it would be allowed to make per pupil payments to school districts other than Benton Harbor for pupils these districts accept on a tuition basis who reside within the Benton Harbor Area School District.

*Paragraph 11*

*A.*

In challenging paragraph 11, defendants initially contend that plaintiffs do not have standing to compel them to survey those districts in the Berrien County Intermediate School District which were not parties in the instant case. Defendants, however, have confused the doctrine of standing with the power of a court to order a remedy. These are two different concepts and the limitations which attend each are very different.

▆▆▆ The question of standing is a threshold issue which determines if a litigant "is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise."[4] *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). The basic limitation is that imposed by Article III of the Constitution which limits a federal court to adjudicating cases in which there is an actual controversy. This has been held to limit the extension of a federal court's jurisdiction to cases in which the plaintiff has suffered " 'some threatened or actual injury resulting from the putatively illegal action.' " *Warth v. Seldin, supra,* at 499, 95 S.Ct. at 2205, 45

4. Among the prudential limitations which have been placed on a litigant's ability to have standing are that (a) he must not be asserting a "generalized grievance" shared in equal measure by all of a large class of citizens, and (b) even when the plaintiff has met the "case and controversy" requirement of Article III, he must generally assert his own legal rights and not the rights of third persons. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975).

L.Ed.2d at 354–355, *quoting from, Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536, 540 (1973).

A court's power to enter a remedy, unlike the question of standing, is not a threshold issue, but only comes into play after standing has been granted and liability determined. It is thus totally distinct from the question of standing and is not to be governed by Article III's limitations. *See, e. g., Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). Instead, the Supreme Court has placed totally different restrictions on a federal court's remedial powers. These require that a court first find a constitutional violation, and then that it tailor the remedy to fit the nature and extent of the violation. *Hills v. Gautreaux, supra*, 425 U.S. at 293–294, 96 S.Ct. at 1544, 47 L.Ed.2d at 801.

In the instant case, there is no dispute that plaintiffs were injured by the action and inaction of the State Board of Education and the Berrien County Intermediate School District for they deprived plaintiffs of their constitutional rights by intentionally confining them to racially segregated schools. *See, Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In light of this substantial injury, plaintiffs were entitled to have standing so that they might seek redress.[5] Since standing is not in question, it is this court's opinion that defendants are really contending that this court's order was not a proper exercise of its remedial powers. This requires that this court examine its proposed remedy to determine if it is tailored to fit the nature and extent of defendants' constitutional violations.

### B.

Defendants rely on *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and argue that this court's remedies may not affect those who are not parties in the instant case. In *Milliken*, the District Court found that the Detroit public schools were unlawfully segregated. The court, however, did not limit its remedy to the Detroit school district, but instead ordered 53 suburban districts, which had not been found liable, to participate in the desegregation plan. In reversing this order, the Supreme Court ruled that unless there was an inter-district violation or effect a court may not order other school districts to participate in a desegregation remedy.

*Milliken*, however, is not dispositive on when a court may order an inter-district type of remedy for its holding has been limited by the Supreme Court's decision in *Hills v. Gautreaux, supra*. To fully understand the scope of permissible remedies, *Hills* must be examined in depth.

In *Hills*, HUD was found to have knowingly sanctioned and assisted the Chicago Housing Authority in selecting public housing sites and assigning tenants on the basis of race. While the violations were committed within the city limits, and there were no inter-district violations, the Seventh Circuit ordered HUD to participate in a remedy which would require it to construct new public housing in metropolitan areas outside Chicago's city limits. On appeal to the Supreme Court, HUD contended that *Milliken* should control because there were no inter-district violations. Two arguments were raised, both of which are similar to those made by defendants in the instant case: (a) that such a remedial order would constitute a grant of relief incommensurate with the constitutional violation to be repaired, and (b) that a remedy requiring conduct to be undertaken beyond the city limits would improperly involve governmental units which did not commit a violation.

In responding to HUD's first contention, the Court ruled that there was a critical distinction between HUD and the suburban school districts in *Milliken* in that HUD had been found to have violated the Constitu-

---

5. None of the aforementioned prudential limitatons are applicable in the instant case. See note 3, *supra*.

704

tion while the suburban districts had not. 425 U.S. at 294, 96 S.Ct. at 1544–1545, 47 L.Ed.2d at 803. This violation was the necessary predicate for the entry of a remedial order against HUD, and imposed a duty on the District Court to use every means available " 'to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation.' " *Hills, supra*, at 297, 96 S.Ct. at 1546, 47 L.Ed.2d at 803, *quoting from Davis v. School Comm'rs of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577, 581 (1971). The broad scope and inherent flexibility of a court's remedial powers are illustrated by the following passage:

> Nothing in the *Milliken* decision suggests a *per se* rule that federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred. As we noted in Part II, *supra* the District Court's proposed remedy in *Milliken* was impermissible because of the limits on the federal judicial power to interfere with the operation of state political entities that were not implicated in unconstitutional conduct. Here, unlike the desegregation remedy found erroneous in *Milliken*, a judicial order directing relief beyond the boundary lines of Chicago will not necessarily entail coercion of uninvolved governmental units, because both CHA and HUD have the authority to operate outside the Chicago city limits.
>
> In this case, it is entirely appropriate and consistent with *Milliken* to order CHA and HUD to attempt to create housing alternatives for the respondents in the Chicago suburbs. Here the wrong committed by HUD confined the respondents to segregated public housing. The relevant geographic area for purposes of the respondents' housing options is the Chicago housing market, not the Chicago city limits.

*Id.*, 425 U.S. at 298, 96 S.Ct. at 1546–1547, 47 L.Ed.2d at 803–804.

The second contention raised in *Hills* was also dismissed by the Supreme Court for it found that an order affecting HUD's conduct beyond the boundaries of Chicago would not impermissibly interfere with local governments. *Id.* 425 U.S. at 300, 96 S.Ct. at 1547, 47 L.Ed.2d 805. The Court ruled that the order would have the same effect on the suburban districts as a discretionary decision by HUD to use its statutory powers to provide racially integrated public housing in the Chicago metropolitan area. This differed from the plan in *Milliken* which would have unnecessarily interfered with the operation of suburban school districts by forcing them to consolidate into one desegregation area. *Id.*

### C.

While defendants urge this court to apply *Milliken* in the instant case, this court is not persuaded. In light of *Gautreaux*, which approved a remedy similar to that ordered in the instant case, it is this court's opinion that it was proper to order defendants to conduct a survey for discriminatory segregation in the school districts of the Berrien County Intermediate School District. If this court's remedy is tested against the two arguments analyzed in *Gautreaux*, it will be seen that it is tailored to fit the nature and extent of defendants' constitutional violations.

■ As in *Gautreaux*, it is clear in the instant case that *Milliken* does not preclude this court's order. The distinction in this case is the same as that in *Gautreaux, i. e.*, the instant defendants have been found guilty of violating both Federal and State Constitutions. Faced with these violations, this court's power to enter a remedy affecting these defendants is broad and may even require that their remedial efforts extend beyond the boundaries of the area in which their violations occurred. *Hills, supra*.

In ordering defendants to undertake acts in school districts that were not parties to the instant suit, this court recognizes that such actions will not "entail coercion of uninvolved governmental units," nor will they impermissibly interfere with these local school districts. *Hills, supra*, 425 U.S. at 298, 300, 96 S.Ct. at 1547, 47 L.Ed.2d at

804, 805. This court has ordered defendants to do no more than that which is mandated by the Michigan Constitution, Michigan statutes, and defendants' own public policy declarations. These surveys should have been undertaken years ago and the fact that they are now ordered by a court is of little consequence.

In the Northwest Ordinance of 1787, the Continental Congress required that Michigan actively foster a sound educational system. It provided that "*[r]eligion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.*" (Emphasis supplied.) This language has been placed in the present Michigan Constitution and thus it leaves no doubt as to the importance of education in Michigan. Mich.Const., Art. VIII, § 1.

For more than a century, Michigan law has required that a unitary school system be used by all local school districts.[6] In *People ex rel. Workman v. Board of Education of Detroit*, 18 Mich. 400 (1869), a challenge was brought by a mulatto resident of Detroit charging that the Detroit Board of Education was violating Michigan Session Law of 1867, Vol. 1, p. 42 [7] by maintaining separate schools for both Black and White students. In ruling that the statute prohibited the maintenance of separate schools for Black and White students, Chief Justice Cooley wrote:

It cannot be seriously urged that with this provision in force, the school board of any district which is subject to it may make regulations which would exclude any resident of the district from any of its schools, because of race or color, or religious belief, or personal peculiarities. It is too plain for argument that an equal right to all the schools, irrespective of all such distinctions, was meant to be established. *Id.*, at 409.

We might, perhaps, take notice of the fact, that immediately preceding the passage of that act, an application was made to this court for a *mandamus* to compel the trustees of one of the union school districts, embracing the city of Jackson, to admit a colored pupil to the same school with white children, notwithstanding they had established a colored school within the district.

If that application was not the immediate occasion of the legislation in question, it is at least highly probable that it presented one of the cases which made new legislation appear important; and if the act was not intended to reach the districts which are empowered to make their own regulations, then we shall witness the remarkable spectacle of a law which assumes to prohibit what the legislature evidently regard as an unjust discrimination, but which is so framed as to reach only those portions of the state where the distinction does not exist, and to exclude from its operation those portions where the legislature is notified that it prevails.

. . . . .

The conclusion is inevitable that the legislature designed the impartial rule they established to be of *universal application.* Id. at 411–412. (Emphasis supplied.)

This policy against state discrimination was specifically placed in the Michigan Constitution. Article I of the Constitution is a Declaration of Rights, and *among these basic rights is a guaranty of equal protection under the law* :

---

6. A unitary school system is one in which "no person is to be effectively excluded from any school because of race or color." *Alexander v. Holmes County Board of Education*, 396 U.S. 19, 20, 90 S.Ct. 29, 30, 24 L.Ed.2d 19, 21 (1969).

7. Session Laws of Michigan of 1867, Vol. 1, p. 42, provides:

All residents of any district shall have an equal right to attend any school therein, pro-vided that this shall not prevent the grading of schools according to the intellectual progress of the pupils, to be taught in separate places when expedient.

In its present form, this statute reads that "[a] separate school or department shall not be kept for a person on account of race, color, or sex." M.C.L.A. § 380.1146.

Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.

The official commentary for this section states that, "[t]he convention record notes that 'the *principal,* but not exclusive, areas of concern are equal opportunities in employment, *education,* housing and public accommodations.'" "What the Proposed New State Constitution Means to You," at 12 (August 1, 1962) (emphasis supplied).

█ This basic concept of equality permeates the Michigan Constitution, and · a specific provision was inserted to protect against discrimination in education. Article VIII, section 2, states that "[e]very school district *shall* provide for the education of its pupils *without* discrimination as to religion, creed, race, *color* or national origin." (Emphasis supplied.)[8] As this court noted in *NAACP v. Lansing Board of Education,* "The use of the word 'shall' indicates that the provision is imperative and mandatory, not one which local officials may implement or not as they choose." 429 F.Supp. 583,

615 (W.D.Mich.1976). The reason why this provision was placed in the Constitution was best expressed by the committee which proposed it at Michigan's Constitutional Convention of 1961:[9]

> The anti-discrimination clause is placed in this section with the full knowledge that some may say it is unnecessary because of the rights established in our federal constitution and United States supreme court decisions.
>
> The committee feels *this concept is so important to the preservation of our democracy that it wishes to leave no doubt as to where Michigan stands on this question.* (Emphasis supplied.)

Official Minutes, Michigan Constitutional Convention of 1961, at 762–763.

The State Board of Education has been given the primary responsibility *to insure that the state's policy of nondiscrimination is complied with by every Michigan school district.* Article VIII, section 3, of the Michigan Constitution gives the State Board "leadership and general supervision *over. all public education,*" and further provides that the Board "*shall* serve as the general planning and coordinating body for

---

**8.** In construing this constitutional provision, this court recognizes that it is designed to guarantee fundamental rights and to protect disadvantaged minorities from the tyranny of the majority. All such constitutional provisions which are in aid of the preservation of human liberty and human rights are not to be lightly disregarded, twisted, or tortured, but instead are to be liberally and beneficially construed. *See, Michigan Farm Bureau v. Secretary of State,* 379 Mich. 387, 151 N.W.2d 797 (1967). The reason for this was best expressed by Mr. Justice Story:

> " 'Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, *and fitted for common understandings.* The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and ·cannot be presumed to admit in them any recondite meaning or any extraordinary

gloss.' (1 Story, Constitution [5th ed], § 451, p. 345.)"

**9.** *This comment was echoed in the Official Comments which accompanied the Michigan Constitution.* These were circulated to Michigan's voters in an effort to explain the purpose and intent of the various provisions. The Comment to Article VIII, section 2, reads in part: "*The antidiscrimination clause is placed in this section as a declaration which leaves no doubt as to where Michigan stands on this question.*" What the Proposed New State Constitution Means to You, at 77 (August 1, 1977).

The importance of this constitutional provision in its protection against discrimination based on color is underscored by remarks made at Michigan's Constitutional Convention of 1961. At the Convention, it was proposed that the word "color" should be deleted ,because the protection it afforded was adequately covered by the terms "race" and "national origin." In responding to this, Mr. J. A. Hannah stated that the word "color" should be left in the Constitution because "*it is in the area of color that the greatest and most unfair discrimination exists.*" Official Minutes, Michigan Constitutional Convention of 1961, at 2558.

all public education." (Emphasis supplied.) M.C.L.A. § 380.1281 reinforces the State Board's duty to enforce the laws against discrimination in education by stating that the SBE *shall* "require each board, and intermediate school board, and the officers thereof to observe the laws relating to schools."

The State Board has also voluntarily assumed a duty to use every effort to eliminate segregation in Michigan's public schools. On April 23, 1966, the State Board of Education and the Michigan Civil Rights Commission [10] adopted a Joint Policy Statement which reads in part: [11]

> The State Board of Education and the Michigan Civil Rights Commission hold that segregation of students in educational programs seriously interferes with the achievement of the equal opportunity guarantees of this State and that segregated schools fail to provide maximum opportunity for the full development of human resources in a democratic society. The State Board of Education and the Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimination of existing racial segregation and discrimination in Michigan's public schools. *It shall be the declared policy of the State Board of Education that in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.* (Emphasis supplied.)

. . . . .

> The Board of Education and the Civil Rights Commission believe that data must be collected to show the racial composition of student bodies and personnel in all public schools as a base line against which future progress can be measured. Staff members from both departments have been instructed to begin a survey next month.

In September of 1967 the Joint Policy Statement was followed up by a letter from the Board which proposed that local school boards act to facilitate integration. *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143, 189 (W.D.Mich.1973); *affirmed,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). After the death of Martin Luther King in 1968, the State Board reaffirmed its stance by declaring it would act to wipe out prejudice. *Id.*

These constitutional, statutory, and public policy statements could not state any more clearly that the State Board has a duty to insure that no discrimination is being practiced in any of Michigan's local school districts. To accomplish this end, this court now holds that the aforementioned declarations place an affirmative duty on the State Board to survey local districts for any racial discrimination and to eradicate it wherever it is found. Such a

---

**10.** The Michigan Constitution created the Civil Rights Commission to secure the equal protection of the civil rights of the people of Michigan. Article V, section 29 of the 1963 Constitution of the State of Michigan reads as follows:

> Civil rights commission; members; term, duties, appropriations. Sec. 29. There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall expire in the same year. It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination.

The Civil Rights Commission has thus been *given a constitutional basis for vigorous enforcement of the antidiscrimination provision.* What the Proposed New State Constitution Means To You, at 10 (August 1, 1962).

**11.** The full text of the 1966 Joint Policy Statement can be found in *Oliver v. Kalamazoo Board of Education,* 346 F.Supp. 766, 776–777 (W.D.Mich.1971). Among the many signers of this document were Damon Keith, presently a judge on the Sixth Circuit Court of Appeals, John Feikens, presently a United States District Judge, and William Gossett, son-in-law of former Chief Justice Charles Evans Hughes.

survey should be nothing new for the SBE because under the 1966 Joint Policy Statement it is already required to participate in a smaller scale survey of local districts to collect data showing the racial structure of students. This survey, however, should be only the starting point for the much broader survey which this court envisions in which the State Board would examine every detail of its local districts in an attempt to abolish discriminatory segregation. This duty to broadly survey is certainly to be implied from M.C.L.A. § 380.1281, *supra*, for how else can the State Board be sure that its constituent districts are observing the laws relating to nondiscrimination in education if it does not thoroughly survey them. The 1966 Joint Policy Statement also must be interpreted to impose a duty on the State Board to broadly survey for discrimination in education; to hold otherwise would require that this court ignore the State Board's avowal to use "every effort" *to prevent and eliminate segregation.*[12]

The Berrien County Intermediate School District is the successor to the County Commissioner. Historically, these County Commissioners had to supervise many things in their local districts, and while some may think that these supervisory powers have recently been reduced, it is this court's opinion that the intermediate district, through its superintendent, still has a duty to affirmatively survey its local districts, and in particular to determine if any acts of racial discrimination have been committed.[13] This duty to survey is to be inferred from M.C.L.A. § 380.653(h) which states that the superintendent shall make written reports to the local boards concerning all matters pertaining to the educational interests of the

district. In this court's opinion, this duty to report carries with it the concomitant duty to survey these local districts; this is because no report can properly analyze the educational interests of a district until data is obtained concerning the district's policies and activities. In conducting these surveys, the Intermediate Superintendent must study all areas relative to education within the district, and this would have to include an examination to determine if there had been any acts of racial discrimination committed by a local district, for it is beyond dispute that such acts can severely affect the educational interests of the district. *Brown v. Board of Education, supra.* If this court were to hold that there was no duty to examine and survey local districts, it would substantially dilute the legislative mandate that the Superintendent take it upon himself to make reports. If the Superintendent is to act on his own, and not just when local districts request his assistance, he must have some way of determining what problems are affecting the educational interests of the district.

This duty to survey is also derived from M.C.L.A. § 380.653(a) which requires that the Intermediate Superintendent "[p]ut into practice the educational policies of the state and of the intermediate board." The foremost educational policy of the state is that local school districts provide for the education of their pupils *without discrimination.* Mich.Const., Art. VIII, § 2, M.C.L.A. § 380.-1146, 1966 Joint Policy Statement. The only way that the Superintendent can be sure that this policy is being put into practice by the local districts is to survey these districts. This would require that the In-

12. This duty to survey carries with it a requirement that the State Board order all of its constituent districts to supply it with any information they might have concerning discrimination in education. M.C.L.A. § 380.1204 requires that a local board make annual reports to the State Board; *these reports should contain information about the progress which the district made to eliminate discrimination.* The superintendent of the intermediate board is not required to make annual reports, but instead has to report when the superintendent requests it. M.C.L.A. § 380.653(f). In this court's opinion,

the State Board must request that the intermediate superintendent supply it with reports on discrimination at least every year. If such an interpretation were not given to the statute, it would have to be declared unconstitutional as applied for the State Board cannot remain *wilfully ignorant* of information which its districts possess concerning acts of discrimination in education.

13. See Appendix A for a history of Michigan's county units of education.

termediate Superintendent conduct ongoing examinations because a district which is presently adhering to the state's policies might one day begin to swerve from them.

There is another reason why both defendants must actively search out and remedy any discrimination in their constituent districts. Defendants have been entrusted with the development of this nation's most precious resource—our children. How they discharge this duty will affect the future of our democratic institutions.[14] If we are ever to put an end to the hatreds and prejudices which have caused the vestiges of slavery to exist for more than one hundred years after the adoption of the Thirteenth and Fourteenth Amendments, then schools must provide an environment where everyone is equal, and a person is not judged by the color of his skin. It should be the purpose of education to promote respect for the individual and for his dignity. It should bring students to a new awareness of themselves, so that each knows that he is a person, and recognizes that he is equal to others, and free and responsible.

The Federal and Michigan Constitutions demand no less than this, for this is the foundation of our country. The Preamble to the United States Constitution serves as a constant reminder that it was enacted "to form a more perfect Union, establish Justice, [and] insure domestic Tranquility . . . ." The Preamble to the Michigan Constitution states that it is intended to secure God's blessings of freedom "to ourselves and our posterity." These goals will never be attained until the idea of equality permeates our thoughts and actions, makes its way into all our institutions, and suffuses the future course of our civilization. We must recognize that every person has an inviolable dignity. It matters not whether he is little or great, poor or rich, Black or White. Every person has his rights and duties and is equal with every other person.

We must commit our full energies to the task of eradicating the effects that racial discrimination has had on American society. We must build bridges of justice, compassion and understanding and we must do so at once. If we do not, we will evolve into two societies, one Black and one White, separate and unequal. Education must be a major tool in accomplishing these objectives, and thus those in charge of our educational systems have a heavy responsibility. They must do more than make policy statements against discrimination, for of what use are words without a determination to work for oneself and through oneself to turn them into reality. Any statement takes on greater significance and effectiveness from the way in which the one who utters it carries it out. Therefore it is appropriate that this court require defendants to use their supervisory powers to survey their constituent districts and eradicate discrimination wherever it is found.

The survey now required by this court should be no different from that which defendants are required to perform under Michigan law—it should be thorough, open, and leave no unanswered questions. In such a case, defendants and their constituent districts should not be heard to complain that the examination intrudes too much into their affairs. It intrudes no further than it would if defendants had properly performed their duties by undertaking it on their own.

One final consideration which this court must examine is whether it has properly tailored the remedy to the geographic area that was most affected by defendants' failure to supervise and search out unlawful segregation. *See Hills v. Gautreaux, supra,* 425 U.S. at 298 and n.13, 98 S.Ct. at 1546–1547, 47 L.Ed.2d at 803–804. In this court's opinion, it has, for the combined actions and inactions of the State Board and Berrien County Intermediate District had an impact which could realistically have been felt throughout the whole BCISD.

14. In *NAACP v. Lansing Board of Education,* 429 F.Supp. 583, 586 589 (W.D.Mich.1976), this court detailed the severe impact which discrimination in education can cause. This court's comments have been reproduced in Appendix B, *infra.*

The State Board of Education has persistently failed to combat discrimination in Michigan's schools. In 1966, it issued its Joint Policy Statement, but by 1971 the SBE had made only slight progress in achieving its objectives, despite recommendations by the Office of Educational Opportunity. *Oliver v. Kalamazoo Board of Education, supra,* at 189–190. In fact, in the 1971 decision involving the segregation of Detroit's public schools, Judge Roth quoted from the 1966 Joint Policy Statement and said: "The State Defendants have . . . failed to take any action to effectuate these policies." *Bradley v. Milliken,* 338 F.Supp. 582, 589 (E.D.Mich.1971), *affirmed* 484 F.2d 215 (6th Cir. 1973). This failure of the State Board to combat discrimination has continued up to the present for in 1973 this court held that the SBE had failed once again to implement its Joint Policy Statement, *Oliver, supra,* at 185–190, and such findings were again made this year in the instant case.

The State Board's persistent failure to implement the Joint Policy Statement has effectively notified all local school districts in the State that it will pursue a policy of nonsupervision in the area of desegregation. These local boards were able to. conclude that they could take actions for creating or perpetuating segregated schools without the interference of the State Board.

In a situation such as this, were the state's leadership has completely broken down, an extra heavy burden is placed on intermediate districts to enforce the laws of the state and the policies of the State Board. In the instant case, however, the Berrien County Intermediate School District was as indifferent as the State in enforcing the principles concerning desegregation. This caused a complete breakdown of the primary and secondary lines of defense and was effective notice to the local school districts within the BCISD that no one would stop them from undertaking acts of discriminatory segregation. In this court's opinion, these are acts which would not have been committed if either the State Board or BCISD had undertaken the duties required of them to enforce compliance with the state and federal Constitutions.

 In this court's opinion, where state and intermediate school defendants have notified local districts that they would not exercise their affirmative duty to correct acts of discriminatory segregation, and this has resulted in one or more local districts committing such acts, it is not improper for a court to order defendants to use their supervisory powers to survey all the other local districts within the intermediate district to determine if these acts of segregation have affected these other districts, and to insure that these other districts have not acted in a similar fashion.[15] *Cf. Keyes v.*

---

15. Defendants are reminded that discrimination is a mental disease that is difficult to contain within artificial political boundaries. It is a disease that has swept across this country borne on the winds of hatred and ignorance, and it has corrupted our political and social institutions. Our history is replete with evidence of prejudice based on skin color, and as Chief Justice Earl Warren commented in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, such actions "are arbitrary and capricious." Blacks were transported from Africa and sold into slavery, and even though they were legally emancipated the vestiges of slavery remain. American Indians were forced to move from their homeland onto reservations when the Whites took their land. Americans of Oriental heritage were placed in compounds during the Second World War. All of this shows how Americans have used skin color as a basis for denying other Americans their inalienable rights. It is for this reason that this

court must view with strict scrutiny any classification based on race. This court will not become a traitor to the Constitution, nor will it allow the defendants in this case to become such.

> No one can deny that the constitution of the United States is the supreme law of the land; and consequently, no act of any state legislature, or of congress, which is repugnant to it, can be of any validity. Now, if an act of a state legislature be repugnant to the constitution of the state, the state court will declare it void; and if such act be repugnant to the constitution of the Union, or a law made under that constitution, which is declared to be *the supreme law of the land, is it not equally void?* And under * such circumstances, if this court should shrink from a discharge of their duty, in giving effect to the supreme law of the land, would they not violate their oath, prove traitors to the con-

*School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). There is no reason why the study should be limited to those districts in which discriminatory segregation has already been found because defendants' failure to supervise extended to the whole intermediate district. There may have been acts of discrimination undertaken in these other local districts which are not yet apparent. To preclude a survey which may uncover this treachery would only benefit the wrongdoer and reward him for his subtleness.

Defendants also argue that they should not be required to survey the Eau Claire and Coloma School Districts because they were defendants in the instant suit and were found liable. It is this court's opinion, however, that these districts should also be surveyed. This court's examination of Eau Claire and Coloma was limited to the area of property transfers from the Benton Harbor Area School District; it did not examine the inner workings of these districts to determine if they may have committed other acts of discriminatory segregation which may have affected their own students, or which affected another district besides Benton Harbor. This court now orders defendants to examine these other districts.

■ As this court has already noted, the State Board of Education and its intermediate districts have an affirmative duty to survey their local districts to insure that no acts of discriminatory segregation have been committed. Where a court has found that a district has committed such acts, it can presume that the State Board and the intermediate district have failed to carry out their duties. In such a case, a court may order them to conduct a survey.

■ Therefore, this court holds that it acted properly in ordering defendants to conduct their survey. This court further holds that it acted properly in requiring that they report their findings to the court, for I must be sure that defendants have conducted a thorough examination of the whole Berrien County Intermediate School District. While making their study, defendants are to also look for acts of discrimination which were committed in the area of housing, such as the placement of public housing and the assigning of tenants and the use of zoning to exclude certain groups; this court recognizes that often times the racial structure in a school is the product of discrimination in housing. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 20, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554, 569 (1971).

To insure that defendants' examination is thorough, plaintiffs and the Benton Harbor Area School District may appoint representatives to accompany defendants when they make their survey. These representatives are to insure that nothing is overlooked. Any expenses incurred by these representatives are to be reimbursed by the State Board of Education.

Thereafter, both plaintiffs and defendants will draw up proposed findings, and these findings and the supporting data are to be turned over to the panel of experts appointed by this court. The panel will review this material and provide this court with an unbiased opinion concerning it.

*Paragraph 4*

■ The State Board of Education also asks this court to clarify paragraph 4 of the

stitution, and forfeit all just claim to the public confidence?*
31 U.S. (Pet. 6) 515, at 572, 8 L.Ed. 483 (1832) (McLean, J.) (Emphasis supplied.) *Worcester v. Georgia.*
**JOHN McLEAN**
The most celebrated opinion written by Justice John McLean of Ohio during his thirty-one years on the Supreme Court was his dissent in *Dred Scott v. Sanford.*[67] His biographer states that McLean's dissent was perhaps the most important of all of the opinions in the case because it "expressed the

northern consensus on the slavery question and was eventually written into the Constitution by the Civil War and the fourteenth amendment."
History of the Sixth Circuit, A Bicentennial Project, P. 51.
Congress is empowered to enforce by appropriate legislation the provisions of the Fourteenth Amendment, and thus has the power to implement and not impede the effectiveness of school desegregation.
*Ipso facto*, the courts and all executive officers shall implement and not impede desegregation.

Amended Order. The SBE states that one or more local districts in the Berrien County Intermediate School District have expressed a willingness to accept tuition transfer students from the Benton Harbor public schools. The State Board wonders if it would be in violation of paragraph 4 by making per pupil payments to these districts for the tuition transfer students they accept from Benton Harbor. While Michigan law allows such payments, M.C.L.A. §§ 388.1421–1427, it is this court's opinion that in the instant case such payments should not be made to these districts, but should instead be paid to the home district of these transfer students—Benton Harbor.

The Benton Harbor Area School District has been found to have committed acts of discriminatory segregation, in violation of the Constitution, and this court has ordered it to participate in a desegregation plan. In *Wright v. Council of the City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), the Supreme Court ruled that where a school system is under an order to desegregate a court may enjoin actions which would impede the desegregation process. In such cases, the acts complained of need not constitute independent constitutional violations, but may be enjoined upon a showing that they had the effect of interfering with the court's decree. *Washington v. Davis,* 426 U.S. 229, 243, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597, 609–610 (1976). As this court noted in its Phase II opinion, the effects need not be overwhelming before a court can act; in some cases a very small impact will suffice. *Berry v. School District of the City of Benton Harbor* (W.D. Mich.1978), 467 F.Supp. 630 at 643.

In the instant case, this court noted that the Benton Harbor Area School District "has been a fragile creature since its creation in 1965." *Id.* at 658. It is a district that was formed with the cooperative efforts of the citizens from several adjoining districts, but it has now become a district where residents have trouble seeing themselves as part of a unified community with the common goal of quality education for all children, *id.,* and where racial motives prompted many of the district's White residents to seek property transfers from the district. It is thus a district which is even more fragile today than it was at its conception, and it is this court's opinion that it would take only a very small impact to disrupt the community and destroy any chances for remedying the violations which this court has found.

In this court's opinion there is little difference between the property transfer petitions which this court has already considered in its Phase II opinion and the present tuition transfer students for they both allow the more affluent members of the Benton Harbor community to have their children "escape" from the predominantly Black Benton Harbor schools. With these requests for transfer coming so soon after this court's order to desegregate, their motives must be suspect. And if the State Board of Education were to do nothing to discourage these transfers, but were instead to pay the surrounding districts for every transfer they accept, it can only have as grave an impact on the Benton Harbor district and its students as the State Board's approval of the Eaman and Sodus II property transfers. When these property transfers were approved by the State Board of Education, this court ruled: "The approval, particularly where approved by the highest educational body in the State, reinforces concepts of inferiority among Black students and exaggerates false notions of superiority among White students. It conveys the impression that the body responsible for all public school students in the State condones the separation of those students upon the basis of race." *Berry v. School District of the City of Benton Harbor* (W.D.Mich.1978), 467 F.Supp. 630 at 658.

Had the State Board shown that these transfers were being undertaken for valid educational reasons, and that they would have no impact on Benton Harbor and would not disrupt the implementation of a desegregation plan, then this court might have been more favorable. However, the State Board has presented no such evidence. It is a reasonable inference from the estab-

lished facts that such transfers will disrupt the desegregation process. As a result, it is this court's holding that the State Board of Education should not make any per pupil payments to other districts for students from Benton Harbor who choose to transfer to these districts' public schools. Instead, this court orders the State Board of Education to consider all these transfers from Benton Harbor as still being students of the Benton Harbor Area School District, and the State Board shall pay the BHASD the per pupil payments it would receive for these students had they chosen to enroll in Benton Harbor.

This court notes, as did the Supreme Court in *Emporia,* that its injunction does not require that the State Board of Education continue this policy for all time. *Emporia, supra,* 407 U.S. at 470, 92 S.Ct. at 2207, 33 L.Ed.2d at 66. Where a valid educational purpose exists for a transfer, and its impact will not disrupt the smooth operation of the desegregation plan, then this court may reconsider its position and allow limited transfers. This, however, is for the future.[16]

## CONCLUSION

The Benton Harbor Area School District can best be compared to those districts which existed in the deep South between the time of *Plessy v. Ferguson* and *Brown v. Board of Education.* It is essential that this be changed, but this breakthrough will not come without self-sacrifice; it can only be accomplished if the educational institutions make an unswerving commitment to uphold human rights by eliminating all discrimination and replacing it with equality.

Human rights are the foundation of equality, and through equality peace can be achieved. To base peace on human rights is to base it on justice. Peace is the work of justice; it is the indivisible life of the human family; it is the state of health of that family. Peace is a successful society.

16. The parties have advised this court that they will supply it with an updated list of tuition transfer students who reside within the Benton Harbor Area School District, but who attend

This same law of nature, and nature's God, that governs the life and conduct of individuals must also regulate the governments of peoples. Peace is not the effect of chaos. It is the sign and fruit of order, with everything that this word implies: permanence, stability, identity. The rights of the human person are "inviolable, inalienable." They are also universal: everywhere man is man, throughout the entire earth, of equal nobility and dignity. Hence there can be no racism, no segregation.

This order manifests itself objectively through four essential criteria: truth, justice, love, and freedom, which are "the four pillars of the house of peace," open to all. By the fact that peace is order, it comes under the control of the intellect and will of man, who is able by science and technical skill to overcome physical or social obstacles and above all to control himself, conforming his conduct to God's eternal law, which is expressed in the natural law. The measure of our success will be the extent to which we can each link true peace with the dignity accorded human life.

Our founding fathers converted these moral virtues into political rights as is evidence by the Declaration of Independence, the Preamble to the Constitution, and the Bill of Rights. If we consider these rights without considering the ingredients of their original moral foundation, we may drift from the truth and the justice intended by the founding fathers.

## APPENDIX A

The position of county commissioner of schools was created in 1891, Michigan Public Acts of 1891, No. 147, § 1, and existed until 1955 when a new school code was adopted. The commissioner's duties did not change much over the years. He was:

(a) to recommend teachers in districts not employing a superintendent.

(b) to suspend a teacher for cause until the local board of education could act.

the public schools of another district. As soon as this information is tabulated it should be supplied.

(c) to classify and control the promotion of pupils.

(d) to make reports in writing to the district board of education.

(e) to visit each of the schools of the county at least once a year to examine the discipline, mode of education, text books, school apparatus, library, progress and proficiency of the pupils, the skill and efficiency of the teacher, and the condition of school property.

(f) to counsel with teachers and school boards as to the course of study to be adopted and pursued, and as to any improvement in the discipline, instruction and management of the school.

(g) to promote the improvement of the county's schools, and to elevate the character and qualifications of the teachers and officers.

(h) to be subject to such rules and instruction as the superintendent of public instruction may prescribe, and to make annual reports of his labors and of the schools of the county.

The School Code of 1955, Michigan Public Acts of 1955, No. 269, restructured Michigan's system of county school administration by making each county a "county school district" which was under the supervision and control of a 5-member county board of education. *Id.* §§ 291–292. This county board was empowered to hire a superintendent, *id.,* who was to be "the legal successor to the powers, duties and responsibilities of the county commissioner of schools." *Id.* § 301. By law he had all the powers and duties granted to the county commissioner, and he also had the following express duties:

(a) to act as executive secretary of the county board of education.

(b) to put into practice the educational policies of the state and of the county board of education.

(c) to supervise and direct the work of assistants and other employees of the county board of education.

(d) in districts not having a superintendent, he was to supervise teachers, classify and control the promotion of pupils, recommend new teachers, and suspend teachers for cause.

(e) to make reports in writing to the board of the district in regard to all matters pertaining to the educational interests of the respective district.

(f) to perform other duties as the Superintendent of Public Instruction may prescribe and to make annual reports to the secretary of his or her official labors and of the county's schools.

In 1962, the "county school district" and the position of "county superintendent" were abolished and replaced by the "intermediate school district." Michigan Public Acts of 1962, No. 190, § 292a. The powers of the intermediate board and the intermediate superintendent remained similar to those of the former county board and county superintendent. Section 301a provided that the superintendent and the intermediate board were in all respects "the legal successor to the powers, duties and responsibilities of the county superintendent and county board of education." Among the duties expressly required of the superintendent were the following:

(a) Put into practice the educational policies of the state and of the board.

(b) Recommend in writing all employees and suspend any employee for cause until the board considers the suspension.

(c) Supervise and direct the work of assistants and other employees of the board.

(d) Recommend in writing all teachers to the boards of education in constituent districts not employing local superintendents.

(e) In constituent districts not employing local superintendents, suspend any teacher for cause until the board of education of the district employing the teacher considers the suspension.

(f) Classify and control the promotion of pupils in constituent districts not employing local superintendents.

(g) Supervise and direct the work of the teachers in constituent districts not employing local superintendents.

(h) Receive the institute fee provided by law, if approved by the board, and pay the same to the treasurer.

(i) Examine and audit the books and records of any constituent school district when directed to do so by the superintendent of public instruction.

(j) Act as assistant conductor of institutes appointed by the superintendent of public instruction, and perform such other duties pertaining thereto as said superintendent shall require.

(k) Perform such duties as the superintendent of public instruction or the board prescribes, receive all forms and communications which may be sent to him by the superintendent of public instruction, dispose of the same as directed by the superintendent of public instruction, make reports as may be required by the superintendent of public instruction and at the close of his term of office deliver all records, books and papers belonging to the office to his successor.

(*l*) Examine the certified copy of statement of moneys proposed to be raised by the constituent districts required by law to be filed with the township clerk and the board of supervisors at the October session of the board, and notify the secretary of the board of education of any local district that fails to file such statements as are required by law or that has failed to qualify for aid under the general appropriating act made for the purpose of aiding in the support of the public school districts of the state of such failure.

(m) To make reports in writing to the boards of education of local districts in regard to all matters pertaining to the educational interests of the local districts.

These, however, were not the superintendent's only powers, for Section 301a, also provided that the superintendent was to have all the powers and duties granted to the county commissioner of schools and county superintendent of schools. He thus inherited a large amount of supervisory duties.

The School Code of 1976 repealed the 1955 School Code and the 1962 amendments concerning intermediate districts. The 1976 Code then readopted much of this former legislation. M.C.L.A. §§ 380.1—.1853. One change which was wrought by the 1976 School Code was that the intermediate superintendent's powers appear to be reduced because he was no longer given the powers and duties of the county commissioner and county superintendent. Instead, his duties are only those which are listed in M.C.L.A. § 380.653.

(a) Put into practice the educational policies of the state and of the intermediate school board.

(b) Recommend in writing all employees.

(c) Suspend an employee for cause until the intermediate school board considers the suspension.

(d) Supervise and direct the work of assistants and other employees of the intermediate school board.

(e) Examine and audit the books and records of a constituent district when directed to do so by the state board.

(f) Perform duties the state board and the intermediate school board prescribe, make reports as may be required by the state board, and at the close of his term of office deliver all records, books, and papers belonging to the office to the intermediate superintendent's successor.

(g) Examine in constituent districts not employing a superintendent the statements of taxes to be raised by the constituent districts required by law to be filed with the township clerk and the county board of commissioners at the October session of the board, and notify the secretary of the board of a constituent district that fails to file tax statements required by law, or has failed to qualify for state school aid.

(h) Make written reports to the boards of constituent districts in regard to all matters pertaining to the educational interests of the districts.

P.A.1976, No. 451, § 653, Imd.Eff. Jan. 13, 1977.

Merely because the superintendent's duties are now limited to those expressly stated in the statute does not mean that his supervisory powers have weakened. M.C.L.A. § 380.653(h) mandates that the intermediate superintendent make written reports to the boards of local districts concerning all matters pertaining to the educational interests of the districts. In this court's opinion, this provision requires that the superintendent make broad investigations for how else can he properly determine what educational interests of the district might need improvement. Thus the superintendent still has an obligation to visit schools and examine and report on such things as the discipline, mode of education, text books, school apparatus, library, proficiency and progress of the students, and skill and efficiency of the teachers. He also has a duty to investigate for any acts of discrimination which might have taken place.

## APPENDIX B

The following is an excerpt from this court's opinion in *NAACP v. Lansing Board of Education*, 429 F.Supp. 583, 586–589 (W.D.Mich.1976):

Educational inequity is a necessary consequence of racial discrimination in and separation of the schools. The reasons which explain this fact are complex, being intricately rooted in the tortured history of race relations of this nation. Over the years, Black experience has been unique in American history. No other racial or ethnic minority was systematically enslaved by the White majority. Rather than having suffered the temporary discomfort and annoyance of social ostracism common to first-generation European ethnic groups, Blacks for hundreds of years were subjected to legally and socially institutionalized economic, spiritual, psychological, social and educational deprivation.

It is appropriate to note Gunnar Myrdal's observation on slavery in his classic, An American Dilemma, in his chapter on "Inequality of Justice: "

"Under slavery the Negro was owned, bought, and sold as property; he was worked, housed, fed, and prevented from doing what he wished if it was contrary to the interests of his master. In general, the Negro slave had no 'rights' which his owner was bound to respect. Even if in legal theory the slave was given the status of a person under the law as well as the status of property, it was the latter viewpoint which, in practice, became the determining one. In the very relationship between master and slave it was inherent that—without recourse to courts—force and bodily punishment and, under certain circumstances, even the killing of the slave was allowed. '. . . (A)ll slaveholders are under the shield of a perpetual license to murder,' exclaimed Hinton R. Helper in his unsparing onslought on the plantation class and the slavery institution. Thomas Jefferson saw clearly the moral danger of the slavery institution:

'The whole commerce between master and slave is a perpetual exercise of the most boisterous passions, the most unremitting despotism on the one part, and degrading submissions on the other. Our children see this, and learn to imitate it. . . . The man must be a prodigy who can retain his manners and morals undepraved by such circumstances. *And with what execration should the statesman be loaded, who,* permitting one half the citizens to trample on the rights of the other, *transforming those into despots, and these into enemies, destroys the morals of one part, and the amor patriae of the other.* . . . [Can] the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that *these liberties are the gift of God?* That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that His justice cannot sleep forever.' " [2] (Emphasis supplied.)

[2] At 530–531 (1944).

Unfortunately, White attitudes originally attendant to the institution of slavery persisted after the adoption of the Thirteen Amendment. Although legal slavery died,

Americans created, during the four decades after the Civil War, a new legal and social pattern of discrimination based upon race. Many of these forms of institutionalized repression have persisted to the present, with the result that Black Americans are often denied the equality to which they are entitled in our constitutional democratic republic.

Inextricably intertwined with the dominating inescapable heritage of slavery and all its attendant dehumanizing ramifications, every aspect of the human condition of many Black people in America today is almost irremediably repressed. These continuing inhuman conditions of uncivilized servitude and inferior status have become known as vestiges of slavery.

The effects of this historical status of subservience and formalized inferiority continued to be pervasive. Past barriers to personal fulfillment and attainment cannot reasonably be minimized in assessing current impediments to equal opportunity. In the context of past officially sanctioned and present subtly insidious and invidious private and public racial discrimination against Black people as a class, a school environment which for whatever reason involves marked, disproportionate racial concentration inherently generates acute consciousness of race. As situated in segregated surroundings, this inflated consciousness triggers artificial, unrealistic personal reactions based on misconceived but, in view of historical predicates, *understandable individual perceptions of the significance of racial differences.*

Although disproportionate racial concentration of Black children in the schools might not have adverse consequences in all times and places, it certainly does in the context of the present forms of social organization, which are conditioned by legacy of slavery. One of the adverse effects of racial segregation is in the area of individual achievement.

Segregated Black children tend to infer that they are isolated from the White majority because of their race, and, drawing on their observations of the deprivations experienced by Black adults, they also tend to infer that their own potential is limited because of their race. It is not surprising that Black children have evidenced reduced self-esteem in a segregated environment and concomitant diminished motivation to succeed. The culturally-induced lack of self-esteem and diminished motivation in turn operate to measurably reduce achievement.

Individual growth in the educational system occurs not only in the area of achievement, the acquisition of cognitive skills, but also in the areas of social and psychological development. Segregation is perhaps more detrimental to the Black student's social and psychological development than to his achievement level. Finding himself isolated to a significant degree from the bulk of the White population, witnessing the disparate superiority of the status of White adults over Black adults in many circumstances, and perhaps further observing a pronounced underrepresentation of Blacks in positions of leadership in his school, where this is the case, the Black child may become reluctant to assert himself in the presence of Whites and unduly pessimistic concerning his ability to interact or compete successfully with Whites of his own generation.[3]

[3] 1 U.S. Commission on Civil Rights, *Racial Isolation in the Public Schools* 114 (1967).

Teacher reaction to segregated educational circumstances frequently operates to the disadvantage of students. Dubbed by some researches as a kind of "self-fulfilling prophecy," the impact on Black students of teacher expectations based on race has been demonstrated by several studies. Affected by racial stereotypes as well as by actual patterns of disparate Black-White performance levels in the general society, teachers may tend to "teach down" to Black children, expecting and therefore eliciting low levels of performance.

The negative impact of racially segregated schools is not confined exclusively to Black students. White students may also react to racial isolation in ways harmful to themselves. White pupils are apt to form

an irrational attitude of *inherent superiority and are apt to develop an unrealistic concept of homogeneous society in which certain values enjoy universal acceptance.* Similarly, because of their cultural isolation, segregated White children tend *to lose sight of those fundamental values of our constitutional system which, while respecting individual differences, favor free access and wide social mobility to all persons regardless of race, creed, or national origin, and which thereby promote a healthy interchange among persons of different backgrounds.*

The state of mind fostered by racial and cultural isolation heightens racial conflicts and divisiveness in the country and thus adversely affects the domestic tranquility the Constitution was designed to promote. White students who have been educated in segregated public schools are thus ill-prepared to deal with the pluralistic society which actually exists in the adult world beyond the classroom.

In part because of segregated schools, as Charles E. Silberman has written:

"[T]he public schools are failing dismally in what has always been regarded as one of their primary tasks—in Horace Mann's phrase, to be *'the great equalizer of the conditions of men,'* facilitating the movement of the poor and disadvantaged into the mainstream of American economic and social life. Far from being 'the great equalizer,' the schools help perpetuate the differences in conditions or at the very least, do little to reduce them. *If the United States is to become a truly just and humane society, the schools will have to do an incomparably better job than they are now doing of educating youngsters from minority-group and lower-class homes* ".[4] (Emphasis supplied.)

[4] Quoted in Senate Select Committee on Equal Educational Opportunity, Toward Equal Educational Opportunity, Sen.Rep. No. 92–000, 92nd Cong., 2d Sess., Part III. Inequality in Education 95 (1972).

The subject of race in America and the consequences of racial segregation in the schools might be explored at much greater length. However, it clearly appears that in the context of modern America, segregated education is detrimental to both Black and White students, creating, especially for Black students, psychological and social difficulties which have a substantial adverse impact on overall individual development. Segregated education plainly denies equal educational opportunity.

The findings made by the court in this case parallel those made by the United States Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [*Brown I*]. In addressing the precise issue of the effect of racial separation on grade and high school students the Supreme Court in *Brown* quoted with approval language from the District Court as follows:

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is *greater* when it has the sanction of law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." 347 U.S. at 494, 74 S.Ct. at 691. (Emphasis supplied.)

Although much may be said about the fact that *Brown* involved obvious and conspicuous state action separating Blacks and Whites by statute, with respect to the simple issue of whether racial separation fundamentally poses a situation of inequity, *Brown* was and is unequivocal. "Separate educational facilities are inherently unequal." 347 U.S. at 495, 74 S.Ct. at 692.

### APPENDIX C

The following materials were exerpted from the book *What the Proposed New State Constitution Means to You* (August 1, 1962). This book was published as a report to the people of Michigan by their elected delegates to the Constitutional Convention

of 1961–62. The purpose of the book was to inform the public about the proposed, new Michigan Constitution. This Constitution was subsequently adopted by the People of Michigan.

## A PREFACE to the
## ADDRESS TO THE PEOPLE

This introductory statement is intended to describe briefly the work of the Michigan Constitutional Convention and summarize what its delegates believe are among the most significant changes proposed for revision of the Michigan Constitution.

\* \* \* \* \* \*

The following summary of major provisions in the revised constitution will indicate the extent to which the convention has met its responsibilities—

\* \* \* \* \* \*

## EDUCATION
Enlarged State Board

An enlarged (8-member) state board of education is given leadership and general supervision of all except higher education. In addition, the board serves as the general coordinating and planning agency for all public education, including higher education. It is to advise the legislature as to the financial requirements of all state educational functions. (emphasis supplied).

The superintendent of public instruction is designated as the principal executive officer of the state department of education, and will be appointed by, and have his term of office fixed by the new state board of education.

\* \* \* \* \* \*

## CIVIL RIGHTS AND ELECTIONS

Traditional liberties and rights of the people were carefully reviewed and changes made are in the direction of clarifying and strengthening them.

Equal Protection Clause

The major addition to the Declaration of Rights is an equal protection clause which is implemented elsewhere in the revised constitution by the creation of a bipartisan civil rights commission. The duty of the commission is twofold:

1. To investigate alleged discrimination because of religion, race, color or national origin.
2. To secure the equal protection of all civil rights without such discrimination, subject to judicial review.

The civil rights commission offers the constitutional basis for vigorous enforcement of the anti-discrimination provision. (emphasis supplied).

\* \* \* \* \* \*

## . . . IN CONCLUSION . . .

The citizen who carefully reviews the proposed new Constitution will undoubtedly find himself unable to agree with every suggested revision. His decision must be made, therefore, on the balance of that which he finds good. Although there were few completely unanimous votes among convention delegates on any given issue, 190 of the 250 sections had nearly unanimous support, and the entire document was approved by better than a 2-to-1 vote of the delegates. (emphasis supplied).

\* \* \* \* \* \*

## EXPLANATORY NOTE

Words printed in *italics* in the revised or new sections of the document indicate the insertion of new matter. The use of stars, thus \* \* \*, indicates the omission of words contained in the present constitution.

Titles in boldface type over each section are not a part of the constitution. They are included only to assist the reader in locating the specific material in which he may be interested.

## PREAMBLE

We, the people of the State of Michigan, grateful to Almighty God for the blessings of freedom, and earnestly desiring to secure these blessings undiminished to ourselves and our posterity, do ordain and establish this constitution. (emphasis supplied).

No change from the Preamble of the present constitution.

## Article I

### DECLARATION OF RIGHTS [1]

**Political power.**

Sec. 1. All political power is inherent in the people. Government is instituted for their equal benefit, security and protection.

No change from Sec. 1, Article II, of the present constitution.

**Equal protection under the law.**

*Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.*

This is a new section. It protects against discrimination because of religion, race, color or national origin in the enjoyment of civil and political rights and grants equal protection of the laws to all persons. The convention record notes that "the principal, but not exclusive, areas of concern are equal opportunities in employment, education, housing and public accommodations." (emphasis supplied).

The legislature is directed to implement this section by appropriate legislation and the proposed constitution establishes a Civil Rights Commission in the Article on the Executive Branch.

\* \* \* \* \* \*

## Article VIII
### EDUCATION

**Principles.**

Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. (emphasis supplied).

No change from Sec. 1, Article XI, of the present constitution.

**Legislative duty to public education.**

Sec. 2. The legislature shall maintain and support a system of free *public elementary and secondary schools as defined by law. * Every school district * * shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin. * * * * * (emphasis supplied).

This is a revision of Sec. 9, Article XI, of the present constitution which fixes responsibility on the legislature to provide "primary" education. To conform to present practice and court interpretations, "primary" is changed to "elementary and secondary". The balance of the section is excluded because its restrictions as to finance and definitions as to basic qualifications needed to be eligible for state aid are better left to legislative determination.

The anti-discrimination clause is placed in this section as a declaration which leaves no doubt as to where Michigan stands on this question. (emphasis supplied).

**State board of education; superintendent of public instruction.**

Sec. 3. *Leadership and general supervision over all public education,* including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, *is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.* (emphasis supplied).

*The state board of education shall appoint a superintendent of public instruction whose term of office shall be determined by the board. He shall be the chairman of the board without the right to vote, and shall be responsible for the execution of its policies. He shall be the principal executive*

---

[1]. Because the Declaration of Rights was placed in the first Article of the Constitution, it indicates the high regard which the drafters had for basic personal freedoms.

officer of a state department of education which shall have powers and duties provided by law.

The state board of education shall consist of eight members who shall be nominated by party conventions and elected at large for terms of eight years as prescribed by law. The governor shall fill any vacancy by appointment for the unexpired term. The governor shall be ex-officio a member of the state board of education without the right to vote.

## APPENDIX D

_U.S. Bishops_

### The National Race Crisis

### Statement of the National Conference of Catholic Bishops

_St. Louis, Mo._ April 25, 1968

### Education

1. Education is a basic need in our society, yet the schooling available to the poor is pitifully inadequate. We cannot break the vicious cycle of poverty producing poverty unless we achieve a breakthrough in our educational system. <u>Quality education for the poor, and especially for minorities who are traditionally victims of discrimination, is a moral imperative if we are to give millions a realistic chance to achieve basic human dignity.</u> Catholic school systems, at all levels, must redouble their efforts, in the face of changing social patterns and despite their own multiple problems, to meet the current social crisis. This crisis is of a magnitude and peril far transcending any which the Church in America or the nation has previously confronted. (Emphasis supplied.)

## APPENDIX E

### III. CLOSING EXHORTATION

Men and women of the late 20th century, you have signed the charters which, if sincerely meant, are the glorious proof that you have recovered your full humanity. But you have written your own moral condemnation into the book of history if they are but pages full of rhetorical velleities or juridical hypocrises. How measure which they are? The measure is the extent to which you link true peace with the dignity accorded human life.

Message of Pope Paul VI for World Peace Day, 1977 (December 8, 1976).