**Barbara Jean BERRY et al., Plaintiffs,**

**v.**

**SCHOOL DISTRICT OF the CITY OF BENTON HARBOR et al., Defendants.**

**No. C.A. 9.**

United States District Court, W. D. Michigan, S. D.

Dec. 15, 1978.

Louis R. Lucas, Elijah Noel, Jr., Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas Atkins, Roxbury, Mass., John A. Dziamba, Willimantic, Conn., Stuart J. Dunnings, Jr., Dunnings & Gibson, Lansing, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP Special Contribution Fund, New York City, for plaintiffs.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Roccy M. DeFrancesco, Adams & DeFrancesco, St. Joseph, Mich., for Benton Harbor School Bd.

John L. Crow, Francis A. Jones, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Clair School Dist.

George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for State of Mich.

E. Michael Stafford, Farhat, Burns & Story, Lansing, Mich., for Coloma School Dist.

Lee Boothby, Boothby & Huff, Berrien Springs, Mich., for Sodus Tp./Fellner Group.

Andrew J. Burch, Coloma, Mich., for intervening defendants Baldwin and Concerned Parents of Hagar Tp. School Dist. No. 4.

Thomas J. Nordberg, Lansing, Mich., for Berrien County Intermediate School Dist.

FOX, Chief Judge.

## PREFACE

### A

Statements made during the Michigan Constitutional Convention of 1961 indicate that the drafters were fully aware of the Supreme Court's school desegregation decisions. The committee which proposed Article VIII, section 2 made the following statement in its support:

> The anti-discrimination clause is placed in this section with the full knowledge that some may say it is unnecessary because of the rights established in our federal constitution and United States supreme court decisions.
>
> The committee feels *this concept is so important to the preservation of our de-*

*mocracy that it wishes to leave no doubt as to where Michigan stands on this question.* (Emphasis supplied.)

Official Minutes, Michigan Constitutional Convention of 1961, at 762–763.

### B

guidelines for
providing integrated education
within school districts

June, 1977

If Michigan is to achieve equal education opportunity, each arm of the educational community—educational agencies and their governing boards, teachers and support staff, parents, students, and citizens in the community, along with each unit of the Michigan Department of Education—must act with commitment and dedication as one body.

### C

In part because of segregated schools, as Charles E. Silberman has written:

> "[T]he public schools are failing dismally in what has always been regarded as one of their primary tasks—in Horace Mann's phrase, to be *'the great equalizer of the conditions of men,'* facilitating the movement of the poor and disadvantaged into the mainstream of American economic and social life. Far from being 'the great equalizer,' the schools help perpetuate the differences in conditions, or at the very least, do little to reduce them. *If the United States is to become a truly just and humane society, the schools will have to do an incomparably better job than they are now doing of educating youngsters from minority-group and lower-class homes.*" (Emphasis supplied.)

*Berry v. School District of City of Benton Harbor,* 442 F.Supp. 1280, 1289–1290 (W.D. Mich.1977).

### D

Thomas Jefferson saw clearly the moral danger of the slavery institution:

" 'The whole commerce between master and slave is a perpetual exercise of the most boisterous passions, the most unremitting despotism on the one part, and degrading submissions on the other. Our children see this, and learn to imitate it. * * * The man must be a prodigy who can retain his manners and morals undepraved by such circumstances. *And with what execration should the statesman be loaded, who,* permitting one half the citizens to trample on the rights of the other, *transforming those into despots, and these into enemies, destroys the morals of one part, and the amor patriae of the other.* * * * [Can] the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that *these liberties are the gift of God?* That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that His justice cannot sleep forever.' " (Emphasis supplied.)

Unfortunately, White attitudes originally attendant to the institution of slavery persisted after the adoption of the Thirteenth Amendment. Although legal slavery died, Americans created, during the four decades after the Civil War, a new legal and social pattern of discrimination based upon race. Many of these forms of institutionalized repression have persisted to the present, with the result that Black Americans are often denied the equality to which they are entitled in our constitutional democratic republic. *Berry* at 1288, quoting from Gunnar Myrdal's, An American Dilemma, at 530–531 (1944).

## OPINION

### I

In this court's opinion and order of November 9, 1978, 467 F.Supp. 695, defendants State Board of Education, Superintendent of Public Instruction, Berrien County Intermediate School District, and Berrien County Intermediate School Superintendent were ordered to participate in a survey of the school districts in Berrien County, Michigan. They have now petitioned this court for an order certifying this decision for an interlocutory appeal under 28 U.S.C. § 1292(b). For the reasons set forth below, defendants' motions are denied.

This is a school desegregation suit involving the schools in the area of Benton Harbor, Michigan. The facts of this case are fully set forth in this court's two earlier opinions in which liability was determined, and for this reason it is unnecessary to repeat these facts. It need only be said that in this court's first opinion (referred to as Phase I) this court ruled that the Benton Harbor Area School District had failed to rebut a prima facie case of school segregation which had been established against it in an earlier trial. *Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280 (W.D.Mich.1977). In the second opinion (Phase II), this court found that defendants, the Governor of the State of Michigan, the Attorney General of the State of Michigan, the State Board of Education, Superintendent of Public Instruction, Berrien County Intermediate School District, and Berrien County Intermediate School Superintendent, had helped to create and/or perpetuate the unlawfully segregated conditions in the Benton Harbor Area School District. *Berry v. School District of the City of Benton Harbor,* C.A.9, 467 F.Supp. 630 (W.D.Mich. July 25, 1978). On August 7, 1978, an amended order was issued which required that defendants found liable in Phases I and II formulate a plan to remedy the constitutional violations found by this court. This amended order required that the following remedial acts be undertaken:

(4) The State Board of Education and its Superintendent have been entrusted with the leadership and general supervision of all public schools in Michigan. Mich. Const., art. VIII, § 3. This court has found, however, that they have failed as both leaders and supervisors for they failed to implement the Joint Policy Statement even though they were aware of the segregation which existed in Ben-

ton Harbor. Therefore, this court permanently enjoins the State Board of Education and its Superintendent from any further acts which would maintain, create, or facilitate the existence of racial segregation and discrimination in the public schools of Berrien County, including the granting of property transfers which have racially segregative impacts.

.        .        .        .        .

(11) The State Board of Education is required to affirmatively put into practice the educational policies of the State and of the Board, and foremost among these policies is the assurance that education be provided without discrimination. Mich. Const., art. VIII, § 2. The Berrien County Intermediate School District has similar duties as this court has found it to have an affirmative duty to offer its supervisory or consultant services to local districts in order to remedy discrimination and its effects.

In light of these affirmative duties to eradicate discrimination, this court orders the State Board of Education and the Berrien County Intermediate School District to undertake a detailed examination of all school districts in Berrien County, especially St. Joseph, Watervliet, River, and Riverside, to determine if discrimination has at any time existed in these districts, and if so, to determine if all vestiges of this discrimination have been eradicated. All findings will be released to this court as soon as they are ready.

Thereafter, the Attorney General, the State Board of Education, Superintendent of Public Instruction, Berrien County Intermediate District, and Superintendent of the Berrien County Intermediate District questioned these two paragraphs. The State and intermediate school districts claimed that this court had no jurisdiction to order the survey required by Paragraph 11; the State Board of Education also wondered if it would be in violation of Paragraph 4 if it made per pupil payments to school districts other than Benton Harbor for pupils these districts accept on a tuition basis who reside within the Benton Harbor Area School District.

In this court's opinion of November 9, 1978, I responded to these challenges and ruled that the ordering of the survey was within the court's broad remedial powers. *Berry v. School District of the City of Benton Harbor*, 467 F.Supp. 695, C.A.9 (W.D. Mich. November 9, 1978). In particular, I ruled that I had ordered defendants to do no more than that which is mandated by the Michigan Constitution, Michigan statutes, and defendants' own public policy statements. *Id.;* these were surveys that should have been undertaken years ago, throughout the state. *Id.* I also ruled that in conducting the survey in Berrien County, defendants are to survey the area of housing for acts of discrimination. *Id.* To insure that defendants' examination is thorough, I ruled that plaintiffs and the Benton Harbor Area School District could appoint representatives to accompany defendants when they make their survey. *Id.*

In addition, I prohibited the State Board of Education from making the requested per pupil payments. *Id.* I ruled instead that all tuition transfer pupils from Benton Harbor, who were attending the public schools of another district, were to be counted as students of the Benton Harbor Area School District, with their per pupil payments paid to Benton Harbor. *Id.*

■ Defendants have now requested that this court certify its November 9, 1978 order for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This section provides in pertinent part:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Defendants initially point out that the paragraphs which were the subject of this court's November 9 order were a part of

this court's August 7, 1978 amended order. Defendants contend that because this August 7 amended order was certified for an interlocutory appeal under § 1292(b) that the November 9 order should also be certified.

This court agrees that its November 9 order is, in a fashion, an expansion of its August 7 amended order. However, merely because this court certified a portion of its August 7 amended order does not mandate that the November 9 order be certified. This court's August 7 certification reads as follows:

> (13) Pursuant to 28 U.S.C. § 1292(b), this court certifies that *with respect to the above findings of liability* this judgment order involves controlling questions of law as to which there are substantial grounds for difference of opinion and further certifies that an immediate appeal from this judgment may materially advance the ultimate termination of this litigation. (Emphasis supplied.)

An examination of this certification clearly indicates that the only issue which was certified concerned the findings of liability. This court did not certify any part of the order which dealt with the remedy. Paragraphs 4 and 11 concerned the remedy, and therefore they were not a part of this court's certification. Defendants' argument that there is controlling precedent for the certification is thus without merit.

Defendants also argue that even if the August 7 amended order does not entitle them to certification, they are entitled to an interlocutory appeal because the November 9 order, by itself, meets the standards set forth in section 1292(b). Under this section, a district judge must find: (1) that the order involves a controlling question of law, (2) that there is a substantial difference of opinion concerning the order, and (3) that an immediate appeal will materially advance the ultimate termination of the litigation.

In determining whether this court's decision involves a controlling question of law, this court is mindful of the Ninth Circuit's interpretation of that issue:

> The legislative history of subsection (b) of section 1292 . . . indicates that it was to be used only in extraordinary cases where decision of an interlocutory appeal might avoid protracted and expensive litigation. It was not intended merely to provide review of difficult rulings in hard cases.

*United States Rubber Co. v. Wright,* 359 F.2d 784, 785 (9th Cir. 1966).

This court is also well aware that the "controlling question" requirement is intimately related to the requirement that its determination "may materially advance the ultimate termination of the litigation." 9 J. Moore, *Federal Practice,* ¶ 110.22[22] (2d ed., 1975); 16 C.A. Wright, et al., *Federal Practice and Procedure,* § 3930, at 163 (1977). One court has ruled that a "controlling question" is "one whose resolution may appreciably shorten the time, effort, and expense exhausted between the filing of a lawsuit and its termination." *E. F. Hutton v. Brown,* 305 F.Supp. 371 (S.D.Tex.1969).

In this court's opinion, an appeal on either issue in this case will not shorten the time needed for the completion of this lawsuit. Instead, it will only serve to delay its conclusion and impede the implementation of a remedy. This suit has been pending since 1967, and now, with the end so near in sight, it would not be in the best interests of justice to grant an appeal which could take over a year to resolve. This delay would have the additional effect of upsetting the schedules of this court's experts, who willingly gave their time to help in the evaluation of the proposed desegregation plans. These men have set aside their time to help the court, and with their aid this case will have a quick conclusion. If a delay is granted, there is no guarantee that these experts will be available to help after the appeal process is finished.

There is an additional reason why the November 9 order will not be certified and this is because it is this court's opinion that there is no substantial difference of opinion concerning its order.

■ Supreme Court precedent makes it clear that this court had the power to enjoin the State Board of Education from making per pupil payments for tuition transfer students from Benton Harbor. *See, Wright v. Council of the City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). If such payments were allowed, it would encourage tuition transfers and would substantially undercut this court's ability to formulate an effective remedy.

As to the survey ordered by this court, defendants still maintain that it conflicts with *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) and thus presents a difference of opinion. However, as this court noted in its opinion, *Milliken* is inapplicable for this case is controlled by the Supreme Court's decision in *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). The facts and the remedy in this case make it almost identical with *Hills,* and because of *Hills,* this court had no other choice except to uphold the remedy it ordered.

■ Merely because this court was the first to rule that the State Board of Education and its intermediate districts had a duty to search for and eliminate discrimination, does not mean that there is a substantial difference of opinion. This court did nothing more than follow the plain meaning of the Michigan Constitution, Michigan statutes, and defendants' own policy declarations.

■ The State Board of Education contends that nowhere in Michigan law is such a survey required. However, the Michigan Constitution, Article I, Declaration of Rights, equal protection under the law, Section 2, states:

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights *or be discriminated against in the exercise thereof because of * * * race, color * * *.* (Emphasis supplied.)

The author-delegates to the Constitutional Convention clearly stated:

This is a new section. It protects against discrimination because of religion, race, color or national origin in the enjoyment of civil and political rights and grants equal protection of the laws to all persons. The convention record notes that "the principal, but not exclusive, areas of concern are equal opportunities in employment, education, housing and public accommodations."

The legislature is directed to implement this section by appropriate legislation and the proposed constitution establishes a Civil Rights Commission in the Article on the Executive Branch.

In addition, Article VIII, section 2 of the Michigan Constitution makes clear that "every school district shall provide for the education of its pupils *without discrimination* as to religion, creed, race, *color* or national origin." (Emphasis supplied.) The State Board has been given the duty to insure that this provision is being complied with by every local school district and intermediate district, Mich.Const., art. VIII, § 3; M.C.L.A. § 380.1281, and while these constitutional and statutory provisions do not specify that there is a duty to survey, it is apparent that they intended that the State Board undertake all duties which are reasonably necessary to insure that the antidiscrimination clause is being complied with. This would have to include the duty to survey, for how else can the State Board tell if a district is in compliance with the law if it does not survey that district.

The undertaking of a survey is also consistent with the public policy statements of the State Board of Education. In 1966, the State Board of Education and the Michigan Civil Rights Commission adopted a Joint Policy Statement in which they agreed to survey local districts in an effort to collect data on the racial structure of students.[1]

1. The full text of the 1966 Joint Policy Statement can be found in *Oliver v. Kalamazoo Bd. of Ed.,* 346 F.Supp. 766, 776 777 (W.D.Mich. 1971). It is also reproduced in the pamphlet

"Guidelines for Providing Integrated Education Within School Districts," at 16–17 (1977); a copy of this pamphlet is reproduced in the appendix of this opinion.

At the time of this declaration, the State Board did not complain that this survey intruded too much into the affairs of local districts. This is an indication that the surveys ordered by this court will not cause undue interference with local districts.

This survey is also consistent with the State Board's pledges that every effort be used to eliminate segregation. In its 1966 Joint Policy Statement, it made such a promise.[2] This was renewed on May 13, 1970 in its "Statement of Integration,"[3] and again it was repeated on October 22, 1975 in a Board Concurrence which states:

It is the declared policy of the Michigan State Board of Education that in all programs administered, supervised or controlled by the Department of Education, *every effort shall be made to prevent and eliminate segregation, promote integration, provide quality integrated education, and assure equal educational opportunities for all children,* youth, and adults. (Emphasis supplied.)

To be true to this promise, the State Board must survey its constituent districts to locate segregation and other acts of discrimination. If anything less were required, then the State Board would not be using "every effort" to eliminate segregation and isolation.

■ The law is also clear that intermediate districts have a duty to survey, thus there is no substantial difference of opinion on this issue either. County units of education have historically had broad investigative powers, *see Berry v. School District of the City of Benton Harbor,* 467 F.Supp. 695, C.A. 9, appendix A (W.D.Mich. November 9, 1978), and these powers have not been lost. Today, the intermediate superintendent has a duty to make reports to all local boards concerning the educational interests of the district, M.C.L.A. § 380.653(h), this duty to report carries with it the duty to survey so that the superintendent can apprise himself of the district's situation and thus make a thorough report. This duty to survey is also mandated by M.C.L.A. § 380.653(a) which requires that the superintendent "[p]ut into practice the educational policies of the state and of the intermediate school board." One of this state's most basic educational policies is that local districts provide for the education of their pupils *without discrimination.* Mich.Const. art. VIII, § 2. To be sure that this policy is being put into practice requires that the superintendent survey his constituent districts.

■ Both defendants also argue that if a survey is to be undertaken it should be done by the Michigan Civil Rights Commission. However, in light of the aforementioned constitutional and statutory obligations to eliminate discrimination in education, it is this court's opinion that in the field of education the State Board and its intermediate districts were intended to have an independent duty to supervise. It is important to note that the State Board of Education and the Civil Rights Commission both signed a Joint Policy Statement in which they pledged to use every effort to eliminate racial segregation. This Policy Statement infers that in the field of education the duty to survey is not the exclusive province of the Civil Rights Commission but is, at the least, a duty which is shared equally with the State Board of Education.

II.

■■ In conducting the survey, defendants are to be guided by Article I, section 2,

---

2. In the 1966 Joint Policy Statement, the State Board of Education and the Michigan Civil Rights Commission made the following pledge:

The State Board of Education and the Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimination of existing racial segregation and discrimination in Michigan's public schools. It shall be the declared policy of the State Board of Education that in programs administered, supervised, or con-trolled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.

3. The full text of this 1970 policy statement is reprinted in the pamphlet "Guidelines for Providing Integrated Education Within School Districts," at 18 (1977). A copy of this pamphlet has been attached to this opinion as an appendix.

and Article VIII, section 2 of the Michigan Constitution. It is plainly evident that Article I, section 2, and Article VIII, section 2 of the Michigan Constitution go beyond the limits of the Fourteenth Amendment by prohibiting all racial segregation, without regard to whether it was caused by a segregative purpose.[4]

■ This court recognizes that a state constitution may be more liberally construed than the federal Constitution, and this has oftentimes been done, especially in the area of individual rights. Justice William Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L. Rev. 489 (1977). The basis for this court's interpretation is found in the plain wording of the Michigan Constitution. Article I, section 2, provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be *discriminated against* in the exercise thereof because of religion, race, color or national origin." (Emphasis supplied.) Article VIII, section

2, requires that every school district "provide for the education of its pupils *without discrimination* as to religion, creed, *race, color* or national origin." (Emphasis supplied.) Each provision prohibits discrimination; the words "discriminate," "discrimination" and "non-discrimination" are words that do not appear in the Fourteenth Amendment, and it is clear that the drafters of the Michigan Constitution, by the use of these words, intended that the Michigan Constitution was to have a broader reach than the Fourteenth Amendment.

■ The drafters' intent can best be seen in Article I, section 2, which, in part, tracks the Fourteenth Amendment by providing that no person is to be denied the equal protection of the laws; however, it goes beyond this and further proclaims that no person is to be discriminated against. This clearly indicates that discrimination and equal protection of the laws are two different concepts under the Michigan Constitution, and thus when a court relies on

4. Although it is unclear if the Fourteenth Amendment prohibits only de jure segregation, this court has generally adhered to the rule that a showing of de jure segregation must be made in order to establish a constitutional violation. *See, Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280 (W.D.Mich. 1977); *Oliver v. Kalamazoo Bd. of Ed.,* 368 F.Supp. 143 (W.D.Mich.1973), *aff'd* 508 F.2d 178 (6th Cir. 1974), *cert denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools. *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). According to *Oliver, supra,* at 182:

> A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies.

This court recognizes that its opinion appears to conflict with two decisions rendered by the Michigan Court of Appeals. *See, Jipping v. Lansing Bd. of Ed.,* 15 Mich.App. 441, 166

N.W.2d 472 (1968); *Mason v. Flint Bd. of Ed.,* 6 Mich.App. 364, 149 N.W.2d 239 (1967). In both cases, the court inferred that under the Michigan Constitution a school district has no duty to redraw attendance boundaries in the absence of a purposeful intent to segregate. This language, however, was dicta for it had no bearing on the real issue before the court which was whether it was *permissible* to consider racial balance when redrawing school attendance boundaries. The court did not have to consider if it was mandatory that attendance boundaries be redrawn to promote racial balance and educational equality, and thus any language to that effect is dicta.

These cases are further distinguishable because the court of appeals, in construing the Michigan Constitution, relied on decisions from federal courts which construed the Fourteenth Amendment. *See, Bell v. School City of Gary, Indiana,* 324 F.2d 209 (7th Cir. 1963), *cert. denied,* 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); *Henry v. Godsell,* 165 F.Supp. 87 (E.D.Mich.1958). These federal cases are inapplicable, however, because they did not involve the Michigan Constitution. The Michigan Constitution distinguishes between equal protection under the law and discrimination. The proper approach would have required that the court of appeals attempt to do what this court has done and rely on the intent of the drafters in interpreting the Michigan Constitution.

the anti-discrimination clause it should not be guided by the traditional equal protection analysis. Instead, this court chooses to rely on the plain wording of Article I, section 2, and Article VIII, section 2, and in neither one does it state that an intent or purpose to discriminate must be proven before liability can be imposed, for that would defeat the clear, plain intent of the drafters proclaimed on August 1, 1963.

At the time that Article I, section 2, and Article VIII, section 2 were proposed for inclusion into Michigan's Constitution of 1963, the only major school desegregation cases which had been decided by the Supreme Court were *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [*Brown I*], and *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) [*Brown II*].[5] In *Brown I*, the Court was concerned with state statutes that required racial separation. While the intent to segregate was clear from the statutes, the Court never held that intent had to be proven in every case. Instead, the Court appears to have left this issue open for it quoted with approval the following language from the District Court's opinion which recognized that all racial segregation, purposeful or not, was harmful to school children:[6]

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is *greater* when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental

development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated 'school system.' " 347 U.S. at 494, 74 S.Ct. at 691. (Emphasis supplied.)

In *Brown II*, the Court again inferred that all segregation offended the Constitution. The Court stated, "These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as possible on a *nondiscriminatory basis.*" *Id.* 349 U.S. at 300, 75 S.Ct. at 756. (Emphasis supplied.)

While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a *system of determining admission to the public schools on a nonracial basis*, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to *effectuate a transition to*

5. The only other cases decided between 1954 and 1963 which considered school desegregation were *Griffin v. School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1963); *Goss v. Board of Ed.*, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Pennsylvania v. Board of Directors*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); *Hawkins v. Board of Control*, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 484 (1955). These cases did not undermine *Brown I's* basic premise that all segregation

was harmful; nor did they make ·clear that intent to segregate had to be proven in order to establish liability.

6. The Court made it clear that segregation was not to be tolerated when it stated: "We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." *Brown I*, 347 U.S. at 495, 74 S.Ct. at 692.

*a racially nondiscriminatory school system.* During this period of transition, the courts will retain jurisdiction of these cases.

*Id.,* at 300–301, 75 S.Ct. at 756 (emphasis supplied).

The drafters of Michigan's Constitution were fully cognizant of *Brown I* and *Brown II,*[7] and it is evident that they intended to prohibit all cases deemed to be harmful.

■■■ If this court were to read an intent requirement into the anti-discrimination clauses of Article I, section 2, and Article VIII, section 2, it would violate basic principles of constitutional interpretation which require that this court give effect to the plain meaning of the words used in the constitutional provision, as these words were understood by the people who adopted the Constitution. *Bond v. Ann Arbor School District,* 383 Mich. 693, 699, 178 N.W.2d 484 (1970). The plain meaning of the word "discrimination" is "a showing of partiality or prejudice in treatment, . . action or policies directed against the welfare of minority groups." Second College Edition, Webster's New World Dictionary of the American Language. Conceivably, discrimination occurs any time school officials fail to remedy racial segregation which is known to exist in their school district.

It is beyond dispute that racial segregation, no matter what the cause, is harmful to school children. This is something which all educators must be aware of for it was first announced in *Brown I, supra,* almost twenty-five years ago and subsequent courts have made similar findings. In *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143 (W.D.Mich.1973), *aff'd* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 413 U.S.

189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1975), this court found that segregated education affects all students, but is substantially more detrimental for Black students.[8] Similar findings were made by Judge Keith in *Davis v. School District of Pontiac,* 309 F.Supp. 734, *aff'd* 443 F.2d 573 (6th Cir. 1971), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). Judge Keith's findings are typical of those made by other courts:

The defendants in this action admit that segregation and racial imbalance exists in the Pontiac School System, and that such a situation is directly harmful to the development of those Negro children who suffer thereunder. The Court begins its decision in this matter confronted with the undisputed fact that Negro children are being deprived of quality education in the Pontiac School System and that early deprivation of innocent young children culminates in permanent, devastating irreparable harm—harm incapable of subsequent correction. Officials of the Pontiac School System admit that these Black children are being given an inferior education, psychologically damaging to their self-image and economically damaging to their ability to perform in an adult world. To a child, segregation "reinforces the idea that he is different, separate and inferior" * * * and the cause of that segregation is irrelevant "as it would make no difference whether it be *de jure* or whether it be by circumstance * * * *de facto*", (Mr. Perdue P. 128) * the harm remains. And so, we observe a generation of children being injured by an admittedly segregated school situation—another generation

---

**7.** Statements made during the Michigan Constitutional Convention of 1961 indicate that the drafters were fully aware of the Supreme Court's school desegregation decisions. The committee which proposed Article VIII, section 2 made the following statement in its support:

The anti-discrimination clause is placed in this section with the full knowledge that some may say it is unnecessary because of the rights established in our federal constitution and United States supreme court decisions.

The committee feels *this concept is so important to the preservation of our democracy that it wishes to leave no doubt as to where Michigan stands on this question.* (Emphasis supplied.)

Official Minutes, Michigan Constitutional Convention of 1961, at 762–763.

**8.** *See, Oliver v. Kalamazoo Bd. of Ed.,* 368 F.Supp. 143, 153–156 (W.D.Mich.1973), *aff'd* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1975).

receiving inferior educations and being deprived of the technical and intellectual skills that will enable them upon graduation to perform in significant positions competently and confidently. No expert need explain that frustrations such as these are often manifested in new forms of both anti-social and self-destructive behavior.

The Michigan State Board of Education has also recognized that segregation is harmful. In its 1966 Joint Policy Statement it declared:

> The State Board of education and the Michigan Civil Rights Commission hold that the segregation of students in educational programs seriously interferes with the achievement of the equal opportunity guarantee of this State and that segregated schools fail to provide maximum opportunity for the full development of human resources in a democratic society.

In 1977, the State Board again recognized the harms of a segregated educational system and the advantages of one that is integrated.[9] In its pamphlet entitled "Guidelines for Providing Integrated Education Within School Districts," the State Board listed three reasons in support of integrated education:

> The State Board believes that integrated education:
>
> A. Provides students increased equality of access to educational resources and to the conditions for improved academic achievement.[6]
>
> B. Provides students an opportunity to learn how to function effectively in multicultural educational ** settings and to develop positive attitudes toward interracial contact.[7]
>
> C. Leads to the re-examination of educational policies and enhances the probability of the adoption of practices that increase the quality of educational resources and programs.

*Id.,* at 2.

The State Board also listed guidelines so that its policy statement on integrated education could be implemented by local school districts. Among these guidelines is the State Board's "Principles of Integrated Education:"

1. Integrated education is a national concern, a state responsibility, and a local function. For this reason, it is State Board of Education policy that all local boards of education should take steps to prevent and eliminate racial segregation.

2. Integrated education should benefit both non-minority and minority students. Integrated learning experiences should provide all students with the opportunity to learn and grow in an environment which reflects positively the various cultural and ethnic backgrounds.[19]

3. Integrated education should include all those factors of school operation that lend themselves to a better understanding of multicultural concepts. These factors include: curriculum matters, non-tracking of students, materials selection and use, staffing practices, community involvement, and student extracurricular activities.

4. Integrated education efforts in each school district should revolve around (a) pupil assignment practices which eliminate racial isolation, (b) equitable hiring and assignment of faculty and staff, and (c) other school practices that foster and promote segregation based on race or national origin.

5. In addition to pupil integration, school districts should develop and implement programs characteristic of integrated education designed to lead to improved levels of academic achievement[20] and humanistic understanding.

In light of the undisputed harm which segregated education causes to Black children, and the recognized advantages of

---

**9.** See the pamphlet entitled "Guidelines for Providing Integrated Education Within School Districts." A copy of this pamphlet is appended to this opinion.

integrated education, it is evident that any school official who fails to remedy segregation in his district, no matter the cause of the segregation, is committing an act of discrimination in violation of Article I, section 2, and Article VIII, section 2 of the Michigan Constitution. When these officials have the power to act, and a remedy is available, then the failure to take the necessary steps to alleviate this harmful situation is as wrong as is the taking of affirmative steps to advance that situation. It is no excuse to state that the segregation was caused by population shifts or by other factors over which the school district had no control; what matters is not what caused the segregation, but that it exists and that it be remedied.

■ A board of education simply cannot permit a segregated situation to come about and then announce that for a Black student to-gain attendance at a given school all he must do is live within the school's attendance area. The maintenance of a neighborhood school policy is pale when compared to the overriding necessity that Black students be placed in an integrated environment so that educational equality can be promoted. Indeed, when school statistics indicate that a segregated condition exists in a district, it is antithetical for school officials to argue that they pursued a racially neutral policy. When faced with these statistics, school officials must act immediately to remedy the segregation. Any failure to act can only be construed as an act of discrimination.

Local school districts have a large amount of power which can be used to easily remedy a segregated situation and no degree of expense should be too unbearable in light of the fact that children's futures are at stake. Among the immediate remedies which can be used are the redrawing of attendance boundaries, pairing of schools, or the ordering of student transportation. The district also has a responsibility to gear its long-term planning so that integrated education

is promoted; this would require that officials use care in selecting sites for new schools, and in determining what schools are to be closed or consolidated. If local districts fail to take steps to eliminate the segregation, then a prima facie violation of Article I, section 2 and Article VIII, section 2 has been established. To rebut this, school officials must prove that they are, in fact, acting with all deliberate speed to establish an integrated school system.

In conducting their survey for discriminatory segregation, defendants must thoroughly examine every facet of every local district, including those areas which the former county superintendent and county commissioner had to survey. *Berry v. School District of the City of Benton Harbor*, 467 F.Supp. 695, C.A. 9, appendix A (W.D. Mich. November 9, 1978). This requires that they visit each school to examine the discipline and disciplinary procedures; the mode of education; the textbooks; the school apparatus; the library; the progress and proficiency of the pupils; the skill and efficiency of the teacher, and the condition of school property, facilities, and all other related activities.

Defendants are hereby ordered to immediately begin the survey which this court has ordered. They shall initially survey all districts that adjoin the beleaguered Benton Harbor Area School District; after these districts have been surveyed all findings are to be turned over to the court and to the experts along with the underlying data that supports the findings. After this part of the survey has been completed, the survey of the remaining districts will be stayed indefinitely. The survey for segregation in housing will be postponed; however, defendants will have to still survey the area of housing in those areas in which it overlaps the field of education. This court will not tolerate any tactics which will impede the progress of the survey, and the filing of motions will not stay this survey.

Appendix to follow.

APPENDIX

guidelines for
providing integrated education
within school districts

contents

FOREWORD ............................................ 736

Background and History of Integrated Education ...................... 737

A Policy Statement on Integrated Education ........................ 740

Implementing the Policy Statement on Integrated
Education Within School Districts ............................. 741

Footnotes ........................................... 746

Appendix 1 — Joint Policy Statement on
                Equality of Educational Opportunity ................. 747

Appendix 2 — State Board of Education Statement
                on School Integration ........................... 748

The State of Michigan, by its Constitutional provisions (Article VIII, Section 2), prohibits discrimination on the basis of race or color in the public schools. Parents, teachers, administrators, and school board members at the local educational level are often caught in the emotional cross currents that flow from desegregation efforts. They face conflicting interpretations of the laws and varying degrees of enforcing the law. As events of recent years have revealed, the complexities of eliminating and preventing segregation have increased, necessitating further clarification and expansion of the Michigan State Board of Education's position on equal educational opportunity and, specifically, integrated education.

The concept of equal educational opportunity encompasses many factors, integrated education being one of them. Other factors include equitable financing, professional development, and eliminating and preventing discrimination based on national origin or ancestry, sex, language differences, age, handicap, and socio-economic status.

Thus, in its continuing role to improve education in Michigan, the State Board of Education is issuing this document updating existing policy and establishing new guidelines. "A Policy Statement and Guidelines for Providing Integrated Education Within School Districts" is one in a series of position statements and guidelines on equal educational opportunity.

Essentially, the task of ensuring equal educational opportunity for all Michigan students by eliminating and preventing segregation is being approached from five vantage points: 1) A Policy Statement outlining the conceptual foundation of integrated education and Guidelines for Providing Integrated Education Within School Districts; 2) Proposed Guidelines for Providing Integrated Education Through Voluntary Inter-District Exchange of Students; 3) Proposed Guidelines for Multicultural Education; 4) Establishment of an Equal Educational Opportunity Advisory Council to the State Board of Education; and 5) Proposed legislation to create community advisory councils to ensure cooperation and harmony during the desegregation-integration process.

The State Board of Education views the adoption of this document and the implementation of these guidelines by all affected school districts as one more positive step in ensuring equal educational opportunity for all students in Michigan.

June, 1977                                    s/ John W. Porter
                                                John W. Porter

## BACKGROUND

Remedies based on the Supreme Court's decision *(Brown v. Topeka Board of Education)* on public school segregation seemed relatively clear and simple in 1954. Yet, in 1977, school districts across the country continue to seek effective resolutions to the problems of educational inequality. While the federal courts continue to seek just solutions, it is imperative that the states, too, take all possible measures necessary to provide effective channels for achieving equal educational opportunity.[a]

The report of The Select Committee on Equal Educational Opportunity of the United States Senate provided some understanding of necessary measures in 1972 when it stated:

> It is among our principal conclusions — as a result of more than two years of intensive study — that quality integrated education is one of the most promising educational policies that this nation and its school systems can pursue if we are to fulfill our commitment to equality of opportunity for our children. Indeed, it is essential, if we are to become a united society which is free of racial prejudice and discrimination.[1]

The State Board of Education endorses the belief that

A. It is unlikely that any child can be expected to succeed in life if the education he is offered is not equal to that generally available. Such an educational opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.[2]

B. Equal educational opportunity is being provided when:[3]

   1. Individuals of different races receive equal educational opportunities.

   2. Individuals of different economic status receive equal educational opportunities.

   3. Individuals in different geographic locations throughout the state receive equal educational opportunities.

   4. Persons of similar abilities recieve equal assistance in developing those abilities.

   5. Continuing efforts are made both to identify the essential features of integrated education[b] and to provide them to all persons with fairness.

   6. All students experience effective teaching and enjoy adequate educational resources.

---

[a] Equal educational opportunity is the opportunity for an education where the state has undertaken to provide it, which must be made available to all on equal terms.

[b] Integrated education is a condition that exists when the learning environment is characterized by mutual cultural respect, interracial acceptance, and a curriculum and staff that are responsive to educational needs of all participants; and when the activities, policies, and practices of an educational institution coherently reflect the needs and concerns of its racial-ethnic composition.

C. Equal educational opportunity (in terms of the outcome of formal schooling) is achieved when representative individuals with similar abilities making similar choices within each group in society have the same chance to participate and succeed in life's activities.[4]

There is evidence which indicates that integrated education as outlined in a U. S. Senate report benefits the students involved.[5] The State Board believes that integrated education:

A. Provides students increased equality of access to educational resources and to the conditions for improved academic achievement.[6]

B. Provides students an opportunity to learn how to function effectively in multicultural educational[c] settings and to develop positive attitudes toward interracial contact.[7]

C. Leads to the re-examination of educational policies and enhances the probability of the adoption of practices that increase the quality of educational resources and programs.[8]

If Michigan is to achieve equal educational opportunity, each arm of the educational community — educational agencies and their governing boards, teachers, and support staff, parents, students, and citizens in the community, along, with each unit of the Michigan Department of Education — must act with commitment and dedication as one body.

## SOME HISTORICAL PERSPECTIVES

In a series of cases following the Supreme Court's 1954 decision that "separate educational facilities are inherently unequal,"[9] the court elaborated upon this finding and imposed altered settings[d] on school districts found to have de jure[e] segregated schools. The courts have widely concluded that the resolution of problems associated with educational inequality must be approached, first through an attack upon segregation in public education.[10]

In 1963, the new Constitution of the State of Michigan gave the State Board of Education the authority for leadership and supervision of Michigan education. Since its inception in 1965, the State Board has attempted to live up to its leadership role, in part through its declarations of support of the concept of equal educational opportunity.

In 1966, the State Board of Education joined with the Michigan Civil Rights Commission in adopting a policy on "Equality of Educational Opportunity."[11] (See Appendix 1)

As a consequence of this joint policy statement, the Department of Education began to focus on two new objectives: (1) identifying the extent of

---

[c] Multicultural education is education that: 1) acknowledges cultural diversity as a fact of life in the United States; 2) affirms that cultural diversity represents a valuable resource which should be preserved and utilized; 3) values diversity and rejects any condescension of cultural differences; 4) views cultural differences as a positive and vital force in the continued development of any society which professes respect for the intrinsic worth of the individual.

[d] Altered settings, commonly described as the desegregation process, is when the affirmative act of a school authority brings about the elimination and prevention of racial segregation with respect to all schools, and in all grades and departments, and in the employment and assignment of teaching and non-teaching personnel in that district.

[e] De jure segregation is the result of governmental action. (De facto segregation is the concentration of racial minority students caused by such circumstances as housing patterns and job availability.)

racial isolation [f] in Michigan public schools; and (2) providing technical assistance to local school authorities in reducing or eliminating racial isolation. At the same time, the State Board of Education directed local boards to consider racial balance along with other educational objectives when making school decisions in order that segregation be eliminated.

In 1967, pursuant to the joint policy statement, the State Board established the Office of Equal Educational Opportunity. This office was given staff responsibility for conducting and supervising departmental efforts to achieve equal educational opportunity in Michigan schools. Since 1967, the Office has been funded principally through monies granted by the U.S. Office of Education to provide assistance to local school districts in resolving problems related to integration matters.

Between the spring of 1967, when the staff of the Office of Equal Educational Opportunity was first assigned to implement the joint policy statement, and the spring of 1970, efforts to eliminate racial isolation in Michigan school districts and to provide equal education for all students were based upon State Board policy which encourages local school officials to voluntarily exercise initiative without state guidelines. A review of this policy in 1970 led the Superintendent of Public Instruction to conclude that, in most instances, the policy had not produced satisfactory results.

As a result, the staff of the Michigan Department of Education in 1970 re-evaluated the kind of activities it should undertake in light of existing Board policies. Consequently, for the past several years, the staff of the Michigan Department of Education has undertaken the development of state guidelines for the various requirements of equal educational opportunity, including within-school-district integration.

In May, 1970, the State Board of Education issued another statement on school integration, which called for means to ensure both the quality and equality of educational opportunity (See Appendix II). The statement reads in part:

> The path to equality of educational opportunity is neither smooth nor precisely marked, and merely assigning students to different schools in an effort to bring about racial balance in those schools will be a meaningless gesture unless immediate steps are taken to provide additional services and improved programs to assure a balanced and quality educational attainment as well as a balanced racial composition. Unless this factor is given top priority, school districts addressing themselves to racial integration simply by providing racial balance can probably expect increased rather than decreased tensions.[12]

In the fall of 1970, the State Board appointed an advisory committee charged with the task of identifying the goals for improving the educational system. Among the goals identified and adopted was one termed "Citizenship and Social Responsibility," which states in part:

> Michigan education must assure the development of mature and responsible citizens, with the full sense of social awareness and moral and ethical values needed in a heterogeneous society . . . It must create within the school system an atmosphere of social justice, responsibility, and equality which will enable students to carry a positive and constructive

---

[f] Racial isolation is a condition existing when the proportion of minority students or staff in a school fails to reflect the proportions of such students and staff in the district as a whole.

attitude about human differences and similarities into their working or community relationships in later life. The schools should provide various learning experiences involving students from different racial, religious, economic and ethnic groups; accordingly, Michigan education should move toward integrated schools which provide an optimum environment for quality education.[13]

In addition to the concern for teaching citizenship and social responsibility, it has been the experience in Michigan and elsewhere that many racial minority students do not perform on achievement tests at a level sufficient to conclude that they are acquiring the needed academic skills. The State Board of Education made "Equality of Educational Opportunity" one of the *Common Goals of Michigan Education.* That goal reads:

Michigan education must ensure that its processes and activities are so structured as to provide equality of educational opportunity for all and to assure that there is no institutionalized oppression of any group, such as racism where it exists. It must also provide for an educational environment conducive to learning. The system must assure that all aspects of the school program — including such matters as educational goals, organization of schools, courses, instructional materials, activities, treatment of students, attitudes, and student and community representation — give full cognizance and proper weight to the contributions and participation of all groups within its structure. The school climate should accommodate the diverse values of our society and make constructive use of these values for the betterment of society.[14]

This goal serves as a statement of broad direction and general purpose for the State Board, the Department of Education, and all Michigan schools. All Department service areas and program units have been directed to develop their objectives and activities to reflect movement toward this goal as well as toward the other common goals of Michigan education.

## NEW PERSPECTIVES ON ACHIEVING INTEGRATED SCHOOLS

The State Board of Education does not believe that federal court intervention is necessarily the best avenue for achieving integration in Michigan schools. It therefore recognizes that additional state actions are needed if there is to be an avoidance of further federal court involvement in the racially isolated school districts.[g]

Recent federal court decisions affecting the Detroit, Pontiac, Kalamazoo, and Lansing school districts have seen the doctrine of the Brown decision applied to Michigan more than to any other northern state.[15]

It is for these reasons that the State Board is proposing the following Guidelines for Providing Integrated Education Within School Districts.[h] These

---

[g] See Part I (p. 9), Criteria for Determining the Existence of Racial Isolation Within a School District.

[h] In those districts implementing court or government agency ordered desegregation plans, and where such plans would warrant administrative measures other than these enumerated herein, the State Board of Education would support the implementation of those measures provided that such measures prevent further racial segregation.

state guidelines have been prepared consistent with the policy of the State Board which reads:

It is the declared policy of the Michigan State Board of Education that in all programs administered, supervised or controlled by the Department of Education, every effort shall be made to prevent and eliminate segregation, promote integration, provide quality integrated education, and assure equal educational opportunities for all children youth, and adults.[16]

## IMPLEMENTING THE POLICY STATEMENT
## ON INTEGRATED EDUCATION
## WITHIN SCHOOL DISTRICTS

These guidelines — which are consistent with previous definitions, rationale, criteria for action, and planning directions — are intended as an aid to all schools dealing with racial identifiability. Specifically, they are suggested for use by local school officials in determining whether any schools in their district are racially isolated.

### A. RACIAL COMPOSITION IN MICHIGAN PUBLIC SCHOOLS

From the data available, it is clear that most racial segregation is found in urban school districts, and that the trend is toward greater racial segregation rather than toward more integrated settings. Information derived from the annual Michigan Department of Education Racial-Ethnic Census shows that in 1976–77 Michigan's public school population totaled two million pupils. Of these pupils

        1,666,004 or 81.6% were White
          313,913 or 15.4% were Black
           32,709 or  1.6% were Latino
           21,571 or  1.1% were American Indian
            8,416 or  0.4% were Asian American [17]

In addition

— Only 16% of Michigan public school non-minority students attend schools where there are more than 5% Black students.

— More than half of the public school buildings in Michigan (2,337) have very few minority students (less than 5%) in their student bodies.

— In the state's fourteen metropolitan core cities,[18] which enroll 465,306 students, 60% of that number are minorities.

— There are 207 public school buildings in the state whose student enrollment is 95% or more minority.

— Over 69% of the minority students, some 261,378, attend schools whose student enrollment is 50% of more minority. When this data is examined by grade level, it is seen that the minority elementary students are the most isolated, with 71.3% of all minority elementary students attending this type of school. Corresponding percentages for junior high and senior high minority students are 69.0% and 66.1%, respectively.

## B. PRINCIPLES OF INTEGRATED EDUCATION

Five principles underlie the preparation of these guidelines. It should be noted that under the laws and Constitution of the State of Michigan the ultimate responsibility for providing educational opportunity belongs to the State Legislature. The State Board of Education has the responsibility for leadership and general supervision over all public education, but the policy of the state has been to delegate to local boards of education the responsibility for operating the schools in a manner designed to provide such opportunities. These principles are:

1. Integrated education is a national concern, a state responsibility, and a local function. For this reason, it is State Board of Education policy that all local boards of education should take steps to prevent and eliminate racial segregation.

2. Integrated education should benefit both non-minority and minority students. Integrated learning experiences should provide all students with the opportunity to learn and grow in an environment which reflects positively the various cultural and ethnic backgrounds.[19]

3. Integrated education should include all those factors of school operation that lend themselves to a better understanding of multicultural concepts. These factors include: curriculum matters, non-tracking of students, materials selection and use, staffing practices, community involvement, and student extracurricular activities.

4. Integrated education efforts in each school district should revolve around (a) pupil assignment practices which eliminate racial isolation, (b) equitable hiring and assignment of faculty and staff, and (c) other school practices that foster and promote segregation based on race or national origin.

5. In addition to pupil integration, school districts should develop and implement programs characteristic of integrated education designed to lead to improved levels of academic achievement[20] and humanistic understanding.

## C. CRITERIA FOR DETERMINING THE EXISTENCE OF RACIAL ISOLATION WITHIN A SCHOOL DISTRICT

The following criteria are to be used in determining the existence of racial isolation within a school district. Racial isolation is a condition existing when the racial composition of students in any building fails to reflect the racial composition of students for the entire district. Care should be taken to ensure, even in districts with low percentages of minority students, that no schools are racially identifiable. The State Board of Education will consider racial isolation to exist in a school district when either one of the following occurs:

1. The percentage of the student enrollment in any individual racial category[i] for any one building varies more than 15 percent above or below the student percentage for that racial category in the district as a whole. Separate percentages must be computed for elementary and secondary buildings.

2. The racial composition of staff in a single building varies more than 125 percent above or 75 percent below the racial category[i] percentages of the faculty in the district as a whole.

---

[i] Racial categories include Blacks, Latinos, American Indians, Asian Americans, and Whites.

The racial composition of staff within school buildings should approximate the ratio of the entire school system. Faculty assignment should not result in making a building racially identifiable. Moreover, the school district, through its employment policies, practices, and procedures, should seek and employ personnel for all of its diverse activities and at all of its facilities by administering every phase of its recruitment and employment program with the intent and spirit of providing integrated education and equal educational opportunity.

## D. PROCEDURES FOR INTEGRATION

1. *School District Reports*

   The Fourth Friday Membership Count, already in existence, provides racial counts of students and staff by building and district. The State Board of Education may request local school districts to submit additional data relevant to the presence and extent of racial isolation.

2. *Review and Findings*

   The Superintendent of Public Instruction shall review this information for the purpose of determining the extent of racial isolation within each district. Where it has been determined that a school in a district is racially isolated, the Superintendent of Public Instruction shall notify, in writing, the school board having jurisdiction over that district. This notification will include, in detail, the indicators used to arrive at the determination of racial isolation.

3. *Development of a Plan*

   Any local board receiving such notification may prepare a plan designed to correct the specified deficiencies and achieve conformity with the principles of integration as outlined in this section. Any affected local school district choosing not to develop a plan should submit to the Michigan Department of Education a rationale for such a decision.

4. *Community Involvement*

   In the preparation of a plan, the local board should inform parents and other citizens of the criteria for a plan. Local boards may appoint a district-wide advisory committee that reflects the racial and ethnic makeup of the district and a wide range of interest groups in the community.

   Groups that should be represented on such a committee include, but are not limited to, student organizations, parent groups, civic and business leaders, social welfare agencies, religious groups, and organizations from labor and industry.

   The advisory committee should: (a) provide input to local district decision-making relative to integration planning, (b) provide a liaison between school officials and the community, and (c) develop a positive response in the community toward the concept of integration.

5. *State General Assistance*

A school board that has been notified that its school district is racially isolated may request in writing that the Department of Education's Equal Educational Opportunity Unit provide general assistance. Following receipt of such a written request, the Equal Educational Opportunity Unit will make such assistance available.

6. *Submission and Content of Plan*

Within 90 days (school days) of notification, the local board should submit to the State Board of Education a plan to correct the problem of racial isolation. Each plan should contain: (a) an explicit commitment by the school board to fulfill the criteria set forth in these guidelines; (b) a detailed description of the action to be taken to correct each specified deficiency, together with a rationale for each action and its intended effect; and (c) a timetable showing specific actions proposed in the plan and dates of initial implementation and completion.

Plans should give information on each of the following items that are appropriate to the particular situation: (a) proposed changes in existing school attendance areas which will include policies pertaining to feeder patterns, attendance boundaries and overcrowding; (b) location of proposed school sites; (c) capacity, age, location, and adequacy of all school facilities; (d) projected additions to existing school buildings, (e) projected faculty and staff assignments by school, position, and race; (f) if necessary, affirmative action plans which would change the racial composition of staff in the district to reflect the racial composition of students; (g) proposed student enrollments by school, grades, and race for a two-year period; (h) curricular and extracurricular offerings in each school and degree of minority student participation; (i) projected transportation needs and resources; (j) past efforts to eliminate the racial isolation of students; (k) per pupil expenditure by building; (l) pupil performance by building; (m) minority parent participation in community advisory groups; (n) disparity in facilities, curriculum, and teaching methods; (o) disparity of access to school sponsored activities, events, and programs; (p) actions of the local board which cause or maintain segregation; and (q) other information that the State Board of Education or Local Board of Education may think necessary for eliminating racial isolation.

7. *Decisions of School Authorities*

All decisions by school authorities concerning the drawing or altering of school attendance lines, the selection of new school sites, and the recruitment, hiring, placement, and reduction of faculty and staff should take into account the objective of decreasing racial segregation.

All proposals should include specific affirmative plans to ensure that the integration process provides an effective learning environment for all students based upon mutual respect among all racial-ethnic groups. Such plans may relate, for example, to curriculum revision, inservice training of personnel, and compensatory programs to enable students to overcome the adverse educational effects of racial segregation.

8. *Ongoing Review of Plan*

The Superintendent of Public Instruction shall maintain an ongoing review of integration efforts and activities in the local school districts through the Equal Educational Opportunity Unit.

9. *Evaluation of Plan*

The Superintendent of Public Instruction shall review plans submitted under these provisions and shall determine whether they comply with the criteria set forth in this section. In making this determination, the Superintendent may require local school boards to furnish additional information.

10. *Responsibility of State Superintendent*

Upon finding that a local board of education has failed to submit a plan and has not provided the rationale for such a decision, or that a submitted plan is unacceptable wholly or in part, or that a submitted plan is conditionally acceptable, the Superintendent of Public Instruction shall promptly advise the local school board of his findings in writing.

The Superintendent of Public Instruction will submit an annual report on the status of the impact of these state guidelines to the State Board of Education. Upon receipt of this report the State Board will submit copies to the Governor, the Legislature, the Michigan Civil Rights Commission, and other interested agencies.

## EXCEPTIONS[j]

Programs, classes and organizational patterns will be reviewed to determine if they are educationally justifiable and should not be considered discriminatory. Prior to Board approval the following processes and criteria will be used to review proposed programs, classes, and educational patterns.

— All exceptions proposed by the local district will be reviewed on a case-by-case basis for instructional content and for adherence to non-discriminatory policies.

— Local school districts will present data to the MDE supporting their rationale for an educationally justifiable exception.

— The programs or services referred to above must be justifiable on the basis of uniquely produced achievement: documented in the case of present programming and validated or probable in the case of proposed programming.

— The program, class, or organizational pattern muust provide services or content for exceptional children in excess of traditional classes. All proposed or required special certification of staff must be in effect when the program becomes operational.

— Testing and/or admission for or to such classes must be on a non-discriminatory basis.

— Retention in the above must be on the basis of continuing need supported by recent testing or other proposed and accepted documentation.

— Granted exception will be provisional and only for the period of time necessary for the delivery of such special services.

---

[j] A school district requesting an exception to the guidelines must submit to the Department of Education for review and approval the rationale for such exception.

[1] U. S. Senate Select Committee on Equal Educational Opportunity, *Toward Equal Educational Opportunity* (Washington, D. C.: U. S. Government Printing Office, 1972), p. 3.

[2] The language of *Brown v. Board of Education of Topeka*, 347 U.S. 483 [, 74 S.Ct. 686, 98 L.Ed. 873] (1954).

[3] National Institute of Education, *EEO Definitions, Assumptions and Questions* (Washington, D. C.: U. S. Government Printing Office, November, 1974).

[4] The language of the U. S. Senate Select Committee on Equal Educational Opportunity, In *Toward Equal Educational Opportunity.*

[5] *Ibid.*, pp. 1–60; James S. Coleman, *et al., Equality of Educational Opportunity: Summary* (Washington, D. C.: U. S. Government Printing Office, 1966), p. 21; Meyer Weinberg, ed., *Integrated Education* (Beverly Hills: The Glencoe Press, 1968); Meyer Weinberg, *Desegregation Research: On Appraisal*, 2nd edition (Bloomington: Phi Delta Kappa, 1970); Daniel U. Levine, ed., *Models for Integrated Education: Alternative Programs of Integrated Education in Metropolitan Areas* (Belmont, CA: Wadsworth, 1971). For an important current review that finds the research inconclusive, see also Nancy H. St. John, *School Desegregation: Outcomes for Children* (New York: Wiley, 1975).

[6] Weinberg, *op. cit.*, p. 311.

[7] Weinberg, *op. cit.*, p. 311.

[8] See, for example, Dr. E. Ray Berry, quoted in *Hearing Before the Select Committee on Equal Educational Opportunity of the U. S. Senate*, 91st Congress, Part 9A (Washington, D. C.: U. S. Government Printing Office, 1970), p. 4335.

[9] *Brown v. Board of Education of Topeka.*

[10] See, for example, *Brown v. Board of Education*, 347 U.S. 483 [, 74 S.Ct. 686, 98 L.Ed. 873] (1954); *Cooper v. Aaron*, 358 U.S. 1 [, 78 S.Ct. 1401, 3 L.Ed.2d 5] (1958); *Hobson v. Hanson*, 269 F.[Supp.] 401 (1967); *Green v. Board of Kent County* (Virginia), 391 U.S. 430 [, 88 S.Ct. 1689, 20 L.Ed.2d 716] (1968); *Swan[n] v. Charlotte-Mecklenburg Board of Education* (North Carolina), 402 U.S. 1 [, 91 S.Ct. 1267, 28 L.Ed.2d 554] (1971); and *Davi[s] v. Board of Education of Pontiac*, 309 F.Supp. 734 (1971) Cf., U. S. Senate Select Committee on Equal Educational Opportunity, *op. cit.*, pp. 1–8.

[11] Michigan Civil Rights Commission and the State Board of Education, "Equality of Educational Opportunity," 1966.

[12] State Board of Education, "Statement on School Integration," May 13, 1970.

[13] The Common Goals of Michigan Education (Lansing: Michigan Department of Education, September, 1971), p. 3.

[14] *Ibid.*

[15] See *Bradley v. Milliken,* [418 U.S. 717,] 94 [S.Ct.] 3112 [, 41 L.Ed.2d 1069] (1974); *Davis v. Board of Education of Pontiac*, 309 F.Supp. 734 (1971); *Oliver v. State Board of Education & Kalamazoo Board of Education*, 421 U.S. 963 [, 95 S.Ct. 1950, 44 L.Ed.2d 449] (1975); *NAACP v. Lansing Board of Education* [429 F.Supp. 583] (Case No. G305–72).

[16] Board concurrence on October 22, 1975.

[17] *School Racial-Ethnic Census* (Lansing: Michigan Department of Education, 1972–73, 1973–74).

[18] These are: Ann Arbor, Battle Creek, Bay City, Detroit, Flint, Grand Rapids, Hamtramck, Highland Park, Jackson, Kalamazoo, Lansing, Muskegon, Pontiac, and Saginaw.

[19] See Kenneth B. Clark, *Prejudice and Your Child* (Boston: Beacon Press, 1955).

[20] U. S. Senate Select Committee on Equal Educational Opportunity, *Toward Equal Educational Opportunity* (Washington, D. C.: U. S. Government Printing Office, 1972), pp. 1–44.

## APPENDIX 1

### Joint Policy Statement
### of the
### STATE BOARD OF EDUCATION and
### MICHIGAN CIVIL RIGHTS COMMISSION
### on
### Equality of Educational Opportunity

In the field of public education Michigan's Constitution and laws guarantee every citizen the right to equal educational opportunities without discrimination because of race, religion, color, or national origin. Two departments of state government share responsibility for upholding this guarantee. The State Board of Education has a constitutional charge to provide leadership and general supervision over all public education, while the Michigan Civil Rights Commission is charged with securing and protecting the civil right to education.

In addition to the declaration of public policy at the State level, the United States Supreme Court, in the case of Brown vs. Board of Education, ruled: "that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal."

The State Board of education and the Michigan Civil Rights Commission hold that the segregation of students in educational programs seriously interferes with the achievement of the equal opportunity guarantee of this State and that segregated schools fail to provide maximum opportunity for the full development of human resources in a democratic society.

The State Board of Education and the Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimination of existing racial segregation and discrimination in Michigan's public schools. It shall be the declared policy of the State Board of Education that in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.

While recognizing that racial imbalance in Michigan schools is closely related to residential segregation patterns, the State Board of Education and the Civil Rights Commission propose that creative efforts by individual school districts are essential and can do much to reduce or eliminate segregation. Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities, reorganization of school attendance districts, and

the transfer of pupils from overcrowded facilities. Each of these situations presents an opportunity for integration.

The State Board of Education and the Civil Rights Commission emphasize also the importance of democratic personnel practices in achieving integration. This requires making affirmative efforts to attract members of minority groups. Staff integration is a necessary objective to be considered by administrators in recruiting, assigning, and promoting personnel. Fair employment practices are not only required by law; they are educationally sound.

The State Board of Education and the Civil Rights Commission further urge local school districts to select instructional materials which encourage respect for diversity of social experience through text and illustrations and reflect the contributions of minority group members to our history and culture. A number of criteria are enumerated in "Guidelines for the Selection of Human Relations Content in Textbooks," published by the Michigan Department of Education.

The State Board of Education and the Civil Rights Commission believe that data must be collected periodically to show the racial composition of student bodies and personnel in all public schools, as a base line against which future progress can be measured. Both agencies will begin next month to assemble information on the present situation.

To implement these policies the State Board of Education has assigned staff of the Department of Education to work cooperatively with the Civil Rights Commission and local school authorities for the purpose of achieving integration at all levels of school activity. The Michigan Civil Rights Commission also stands ready to assist local school boards in defining problem areas and moving affirmatively to achieve quality integrated education.

*Adopted and signed this twenty-third Day of April, 1966*

## APPENDIX 2

State of Michigan
State Board of Education

## STATEMENT ON
## SCHOOL INTEGRATION

The State Board of Education on April 23, 1966, adopted a joint policy statement with the Michigan Civil Rights Commission which directed local school boards to consider the factor of racial balance, along with other educational considerations, in making decisions about selection of new school sites, expansion of present facilities, reorganization of school attendance districts, and the transfer of pupils from overcrowded facilities. Each of these situations, according to the policy statement, "presents an opportunity for integration."

The recent decisions of the school districts to address themselves to the issue of racial isolation in schools is encouraging. In an effort to provide equality of educational opportunity, the Detroit Board of Education has taken an initial step to address itself to the many faceted problem of racial segregation and the barriers which it creates. The Detroit plan, with its strengths and weaknesses, is an effort to solve the problem.

The path to equality of educational opportunity is neither smooth nor precisely marked, and merely assigning students to different schools in an effort to bring about racial balance in those schools will be a meaningless gesture unless

immediate steps are taken to provide additional services and improved programs to assure a balanced and quality educational attainment as well as a balanced racial composition. Unless this factor is given top priority, school districts addressing themselves to racial integration simply by providing racial balance can probably expect increased rather than decreased tensions. Consequently, the Detroit Board of Education decision will not automatically make the Detroit school system better. However, with the support of students, teachers, and parents, and with the recognition that the decision hopefully represents a step toward quality education for all students, such decisions can be considered fundamental.

Actions taken by Michigan school districts to reduce the harmful educational effects of racial isolation are consistent with the equal educational opportunity position of the State Board of Education. Once such actions are taken by duly constituted authorities, public support is vital to their success. The State Board of Education urges public support of conscientious and constructive efforts to achieve racial integration in the schools.

Adopted May 13, 1970

For additional information, contact Michigan Department of Education, Office of Equal Educational Opportunity, Box 30008, Lansing, MI. 48909 — Phone (517) 373–3497

---

### MICHIGAN STATE BOARD OF EDUCATION STATEMENT OF ASSURANCE OF COMPLIANCE WITH FEDERAL LAW

The Michigan State Board of Education hereby agrees that it will comply with Federal laws prohibiting discrimination and with all requirements imposed by or pursuant to regulations of the U. S. Department of Health, Education and Welfare. Therefore, it shall be the policy of the Michigan State Board of Education that no person on the basis of race, color, religion, national origin or ancestry, age, sex, or marital status shall be discriminated against, excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any federally funded program or activity for which the Michigan State Board of Education is responsible or for which it receives federal financial assistance from the Department of Health, Education and Welfare. This policy of nondiscrimination shall also apply to otherwise qualified handicapped individuals.

---

## III. CLOSING EXHORTATION

Men and women of the late 20th century, you have signed the charters which, if sincerely meant, are the glorious proof that you have recovered your full humanity. But you have written your own moral condemnation into the book of history if they are but pages full of rhetorical velleities or juridical hypocrises. How measure which they are? The measure is

750

the extent to which you link true peace with the dignity accorded human life.

Message of Pope Paul VI for World Peace Day, 1977 (December 8, 1976).